## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

EBRAHIM SHANEHCHIAN, Individually And On Behalf of All Others Similarly Situated,

Plaintiff,

vs.

MACY'S INC., KAREN M. HOGUET, TERRY J. LUNDGREN, MEYER FELDBERG, SARA LEVINSON, JOSEPH NEUBAUER, JOSEPH A. PICHLER, JOYCE M. ROCHE, KARL M. VON DER HEYDEN, CRAIG E. WEATHERUP, MARNA C. WHITTINGTON, WILLIAM STIRITZ, STEPHEN J. O'BRYAN, ROBERT G. ZIMMER, THE PLAN COMMITTEE(S) FOR THE MACY'S, INC. PROFIT SHARING 401(K) INVESTMENT PLAN AND THE MAY DEPARTMENT STORES COMPANY PROFIT SHARING PLAN, and JOHN DOES 1-25,

Defendants.

Civil Action No. 1 : 07 CV 823

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

07 OCT -3 PH 3: 23

Plaintiff Ebrahim Shanehchian ("Plaintiff"), individually and on behalf of a class of similarly situated participants and beneficiaries (the "Class") of the Macy's, Inc. Profit Sharing 401(k) Investment Plan (the "401(k) Plan") and the May Department Stores Company Profit Sharing Plan (the "May Plan") (collectively, the "Plans"), alleges the following based upon the investigation of counsel, and upon personal knowledge as to facts pertaining to Plaintiff and on information and belief as to all other facts:

## NATURE OF THE ACTION

1.    This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. § 1132, against fiduciaries of the Plans who are and were responsible for the investment of the assets and

the administration of the Plans between the dates of February 27, 2005 through and including the present (the "Class Period"). During the Class Period, the Plans' fiduciaries, including Macy's, Inc. ("Macy's" or the "Company") and certain of its senior officers and directors, breached the fiduciary duties they owed to the Plans' participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

2.     Plaintiff was a Macy's employee and participant during the Class Period. As a participant, Plaintiff, like other members of the Class, was entitled to set aside a certain percentage of his annual base salary for investment in various investment options provided by the Plans. Among the investment options in the Plans was the Macy's Stock Fund or Macy's Common Stock Fund (collectively, the "Company Stock Fund") which invested primarily in Macy's common stock.

3.     The Plans have two main components: (a) a component in which Participants make voluntary, pre-tax contributions to the Plans out of their base pay (the "Participant Contribution Component"), and (b) a component in which the Company matches a portion of the Participants' contribution to the Plans (the "Company Match"). Macy's common stock was offered as an investment alternative for Participants and was the sole source of the Company Match.

4.     Throughout the Class Period, the Plans invested heavily in Macy's common stock. Combined, the 401(k) Plan and the May Plan hold for investment approximately 30% of its total assets in Macy's common stock. Because the Plans' holdings in Macy's common stock comprised a significant percentage of the overall value of the assets that the Plans held on behalf of the Participants, the long-term retirement

2

savings of Participants were dependent, to a substantial degree, on the performance of Macy's common stock. So too were Participants' retirement fortunes dependent on the related need for prudent fiduciary decisions by Defendants, concerning such a large, ongoing investment of the Plans' assets.

5.     On February 27, 2005, Macy's entered into an agreement and plan of merger with The May Department Stores Company ("May").[1]    The merger was completed on August 30, 2005, at which point, Macy's acquired nearly 500 May department stores, which Macy's intended to convert into Macy's brand stores.

6.     The Plans' fiduciaries should have known that during the Class Period, Macy's had made a series of material misrepresentations and omissions regarding the Company's declining sales growth and its failures in converting the newly acquired May stores into Macy's brand stores (the "Integration Process") which caused Macy's common stock to trade at artificially inflated levels.

7.     Although Defendants continued to cause the Plans to hold and the Participants to acquire Macy's common stock during this time, company insiders were selling shares of their own Macy's common stock in unusually large amounts. In fact, as alleged below, several of the individual Defendants named herein that were also fiduciaries of the Plans sold more than $25 million of their personally held Macy's common stock despite allowing the Plans and the Participants to acquire and hold Macy's common stock.

8.     Beginning on May 10, 2007, after certain individual Defendants had completed their sales, the Company began to reveal its overstated sales forecasts and

---

[1] At the time Macy's entered into this agreement and plan of merger with May, Macy's was called Federated Department Stores, Inc., changing its name to Macy's effective June 1, 2007.

failures in the Integration Process. In response to the Company's public disclosures, and on through, August 15, 2007 the Company's stock price dropped approximately 34% from a closing price of $43.82 per share on May 9 down to a price of $29.13 per share on August 16, 2007 -- a loss of several billion dollars in market capitalization which significantly reduced the value of the Plans' assets and Participants' vested retirement benefits.

9.      Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period, as is required by ERISA. Defendants breached their fiduciary duties owed to the Plans and the Participants under ERISA by, among other things:

(a)     Selecting and maintaining the Company Stock Fund as an investment alternative under the Plans and permitting the Plans to buy and hold shares of Macy's common stock during the Class Period when the same represented an imprudent investment;

(b)     Encouraging Macy's employees to invest in the Company Stock Fund;

(c)     Continuing to invest the Company Match in the Company Stock Fund and failing to divest the Plans from shares of Macy's stock when continuing to do so became imprudent as a result of the Company's false and misleading statements and omissions regarding its declining sales growth and failures in the Integration Process;

(d)     Abdicating their continuing duty to review, evaluate and monitor the suitability of the Plans' investment in the Company Stock Fund; and

4

(e) Failing to provide accurate, material information to Participants about Macy's financial health and the Integration Process necessary to enable Participants to make informed investment decisions concerning their contributions invested in the Company Stock Fund.

10. As a result of Defendants' breaches of their fiduciary duties, Plaintiff and members of the Class have suffered substantial losses of retirement savings and anticipated retirement income from the Plans. As such, under ERISA, Defendants are obligated to restore to the Plans the losses that resulted from their breaches of their fiduciary duties pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

11. In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

## JURISDICTION AND VENUE

12. This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

13. ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States, and this

5

Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Ohio.

14.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

15.    Plaintiff Ebrahim Shanehchian is a resident of the State of Texas and is and was at all relevant times a participant in the 401(k) Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Among other available options under the Plans, Plaintiff selected the Company Stock Fund[2] for his retirement account.

16.    Defendant Macy's is a corporation organized under the laws of Delaware, with its principal executive offices located at 7 West 7th Street, Cincinnati, OH 45202. Macy's, through its subsidiaries, operates department stores, selling a range of merchandise, including men's, women's, and children's apparel; and accessories, cosmetics, home furnishings, and other consumer goods. As of February 3, 2007, the Company operated approximately 850 retail stores in 45 states, the District of Columbia, Guam, and Puerto Rico under the names Macy's and Bloomingdale's. During the Class Period, Macy's common stock traded on the New York Stock Exchange.

---

[2]   At the time that Plaintiff selected the Company Stock Fund investment option under the 401(k) Plan, that investment option was called the "Federated Stock Fund." Effective June 1, 2007, the name of the Federated Department Stores, Inc. Profit Sharing 401(k) Investment Plan was changed to the Macy's Inc. Profit Sharing 401(k) Investment Plan.

6

17.     During the Class Period, Macy's was the sponsor and administrator of the Plans and exercised discretionary authority over the Plans, acting through its Board of Directors (the "Board"), its officers, and the Pension and Profit Sharing Committee appointed by the Board to administer the Plans (the "Plan Committee") with respect to the management and administration of the Plans and/or the management and disposition of the Plans' assets.

18.     Defendant Karen M. Hoguet ("Hoguet") served as the Company's Chief Financial Officer and Executive Vice President during the Class Period. Hoguet signed the Company's Form 11-Ks filed with the Securities and Exchange Commission ("SEC") during the Class Period. Because of Hoguet's positions with the Company, she participated in the day-to-day management and overall direction of the Company, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, financial condition, and the Integration Process. Because of her access to such information, Hoguet should have known about the Company's material misrepresentations and omissions which caused Macy's to overstate its sales growth and Macy's common stock to trade at artificially inflated stock prices.

19.     Defendant Terry J. Lundgren ("Lundgren") served as the Company's President, Chief Executive Officer, and Chairman of the Board during the Class Period. Because of Lundgren's positions with the Company, he participated in the day-to-day management and overall direction of the Company, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, financial condition, and the Integration Process. Because of

7

his access to such information, Lundgren should have known about the Company's material misrepresentations and omissions which caused Macy's to overstate its sales growth and Macy's common stock to trade at artificially inflated stock prices.

20. Defendants Hoguet and Lundgren are collectively referred herein as the "Officer Defendants."

21. Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plans. One of the Board's many roles or functions is the power to appoint the members of the Plan Committee (as defined in ¶¶ 17, 32). Upon information and belief, the Board likewise exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries, and with respect to the management of the Plans. Based on the above, the Board is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority or control with respect to the appointment of other fiduciaries of the Plans.

22. Defendant Meyer Feldberg ("Feldberg") served as a director on the Board during the Class Period. Feldberg has been Dean Emeritus and Sanford Bernstein Professor of Leadership and Ethics at Columbia Business School at Columbia University since June 2004. Prior to that time, he served as the Dean of the Columbia Business School at Columbia University from 1989 to June 2004. He is currently on leave of absence from Columbia University and is serving as a Senior Advisor at Morgan Stanley. He is also a member of the boards of directors of Revlon, Inc., Primedia, Inc., UBS

8

Global Asset Management and SAPPI Limited. Feldberg has been a director on the Board since May 1992. He currently serves as the Vice Chair of the Board's Compensation and Management Development Committee and as a member of the Nominating and Corporate Governance Committee. Feldberg was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

23. Defendant Sara Levinson ("Levinson") served as a director on the Board during the Class Period. Levinson has been the Non-Executive Chairman of ClubMom, Inc. since October 2002 and was President of the Women's Group of Rodale, Inc. from October 2002 until June 2005. Prior to October 2000, she was President of NFL Properties, Inc. since September 1994. Levinson is also a member of the board of directors of Harley Davidson, Inc. and KickApps Corporation. Levinson has been a director on the Board since May 1997. She currently serves as a member of the Board's Compensation and Management Development Committee and as a member of the Nominating and Corporate Governance Committee. Levinson was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

24. Defendant Joseph Neubauer ("Neubauer") served as a director on the Board during the Class Period. Neubauer has been Chairman and Chief Executive

9

Officer of ARAMARK Holdings Corporation since January 2007. He is also a member of the boards of directors of ARAMARK Corporation, Verizon Communications, Inc. and Wachovia Corporation. Neubauer has been a director on the Board of Macy's since September 1992. He currently serves as the Vice Chair of the Board's Audit Committee and Nominating and Corporate Governance Committee and as a member of the Board's Compensation and Management Development Committee. Neubauer was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

25. Defendant Joseph A. Pichler ("Pichler") served as a director on the Board during the Class Period. Pichler was Chairman of The Kroger Co. from June 2003 until June 2004 and was Chairman and Chief Executive Officer of The Kroger Co. from September 1990 until June 2003. Pichler has been a director on the Board of Macy's since December 1997. He currently serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compensation and Management Development Committee. Pichler was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

26. Defendant Joyce M. Roche ("Roche") served as a director on the Board during the Class Period. Roche is the President and Chief Executive Officer of Girls

10

Incorporated. Roché is also a member of the boards of directors of Anheuser-Busch Companies, Inc., AT&T, Inc. and Tupperware Corporation. Roché has been a director on the Board of Macy's since February 2006. She currently serves as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee. Roche was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

27. Defendant Karl M. von der Heyden ("von der Heyden") served as a director on the Board during the Class Period. von der Heyden was Vice Chairman of the Board of Directors of PepsiCo, Inc. from September 1996 to January 2001. He is also a member of the board of directors of the New York Stock Exchange Group and Dreamworks Animation SKG, Inc. von der Heyden has been a director since February 1992. He currently serves as Chair of the Board's Finance Committee and as a member of the Board's Compensation and Management Development Committee. von der Heyden was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

28. Defendant Craig E. Weatherup ("Weatherup") served as a director on the Board during the Class Period. Weatherup was Chairman and Chief Executive Officer of The Pepsi Bottling Group, Inc. from November 1998 until January 2003. Weatherup is also a member of the board of directors of Starbucks Corporation. Weatherup has been a

11

director of the Board of Macy's since August 1996. He currently serves as Chair of the Board's Compensation and Management Development Committee and as a member of the Board's Nominating and Corporate Governance Committee. Weatherup was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

29. Defendant Marna C. Whittington ("Whittington") served as a director on the Board during the Class Period. Whittington has been President of Nicholas Applegate Capital Management since 2001 and Chief Operating Officer of Allianz Global Investors, the parent of Nicholas Applegate Capital Management, since 2002. Whittington is also a member of the board of directors of Rohm & Haas Company. Dr. Whittington has been a director on the Board of Macy's since June 1993. She currently serves as Chair of the Board's Audit Committee and as Vice Chair of the Board's Finance Committee. Whittington was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

30. Defendant William Stiritz ("Stiritz") served as a director on the Board during the Class Period. Prior to his retirement from the Board in May 2007, Stiritz served as a member of the Board's Audit Committee and Finance Committee. Stiritz was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary

12

authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

31. Defendants Lundgren, Feldberg, Levinson, Neubauer, Pichler, Roche, von der Heyden, Weatherup, Whittington, and Stiritz served as directors on the Board during the Class Period and are collectively referenced herein as the "Director Defendants."

32. Defendant Plan Committee served as the "administrator" and "named fiduciary" of the Plans during the Class Period. The Plan Committee was the principal group responsible for management and evaluation of the investment of the Plans' assets during the Class Period. Members of the Plan Committee were appointed by the Board and included officers and other employees of the Company who participated in managing and administering the Plans (collectively, the "Plan Committee Defendants").

33. Defendant Stephen J. O'Bryan ("O'Bryan") served as a member of the Plan Committee during the Class Period. O'Bryan signed the Company's Form 5500 filed with the Internal Revenue Service ("IRS") for the 401(k) Plan filed for the year 2004 as the individual signing as the plan administrator.

34. Defendant Robert G. Zimmer ("Zimmer") served as a member of the Plan Committee during the Class Period. Zimmer signed the Company's Form 5500 filed with the IRS for the May Plan filed for the year 2005 as the individual signing as the plan administrator.

35. Defendant John Does 1-20 consist of the remaining Plan Committee Defendants. Because Plaintiff is currently unaware of the true identities and capacities of the remaining Plan Committee Defendants, those individuals are named as John Does 1-

13

20. The Plan Committee Defendants, whose real names will be substituted when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plans and their assets.

36. Pursuant to the terms of the 401(k) Plan, the Plan Committee, as a Named Fiduciary under the 401(k) Plan, may appoint an Investment Manager to manage, acquire, and dispose of the assets of the 401(k) Plan. Pursuant to the terms of the 401(k) Plan, the Plan Committee requires an appointed Investment Manager to acknowledge that it is a fiduciary of the 401(k) Plan within the meaning of Section 3(21)(A) of ERISA.

37. John Does 21-25 consist of the Investment Manager Defendants. Because Plaintiff is currently unaware of the true identities and capacities of the Investment Manager Defendants, those individuals are named as John Does 21-25. The Investment Manager Defendants, whole real names will be substituted when they are known to Plaintiff, exercised discretionary authority and discretionary control with respect to the management of the Plans and their assets.

## THE PLANS

38. The Plans are employee benefit plans within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

39. The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for Participants and for benefits based solely upon the amount contributed to Participants' accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such

14

Participants' accounts. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.

40. According to the Company's Form 11-Ks and Form 5500s, Macy's is the sponsor and administrator of the Plans within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

**The 401(k) Plan**

41. The 401(k) Plan is administered by Macy's through the Plan Committee. JP Morgan Chase Bank ("JP Morgan"), as "Trustee" of the 401(k) Plan, holds the 401(k) Plan's assets exclusively and serves as Trustee custodian for the Master Trust under the terms of the Master Trust agreement between Macy's and JP Morgan.

42. The 401(k) Plan is a "401(k)" voluntary contribution plan whereby plan participants direct the plan to purchase investments from among the investment options available in the plan and allocate them to participants' individual accounts. Participants may only direct their contributions to one of the limited investment options offered by the plan sponsor and administrator. One of the options for investment of participant contributions in the 401(k) Plan is the Company Stock Fund. Participants may elect to contribute an amount up to 25% of their eligible compensation to the 401(k) Plan, up to 50% of which may be invested in the Company Stock Fund.

43. According to the Company's website, Macy's describes the 401(k) Plan as "the most enriching form of retirement savings a company can offer."

44. Effective October 1, 2006, the 401(k) Plan was amended to establish a Macy's Employee Stock Option Plan ("ESOP") within the Company Stock Fund. On information and belief, the portion of the 401(k) Plan that invested in the Company Stock

15

Fund does not qualify as an ESOP under the numerous requirements set forth in both ERISA and the Internal Revenue Code. Upon information and belief, the 401(k) Plan's Summary Plan Description is silent with regard to the 401(k) Plan's purported status as an ESOP.

45. Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any portion of the 401(k) Plan be invested in the Company Stock Fund. The requirement was simply that if a portion of the 401(k) Plan were invested in the Company Stock Fund, that portion would be an ESOP. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities and the 401(k) Plan's purported ESOP status did not, in fact, require the investment in the Company Stock Fund at all, or place any constraints on 401(k) Plan fiduciaries forcing them to invest in the Company Stock Fund.

46. Similarly, the 401(k) Plan could have held one share of Macy's common stock and still been an ESOP because that "portion" of the 401(k) Plan – the one share – would have been primarily invested in Macy's common stock.

47. Finally, even if the portion of the 401(k) Plan invested in the Company Stock Fund constituted an ESOP, Plan fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspect of investment of qualified employer securities in an ESOP, the 401(k) Plan fiduciaries remain bound by their other core ERISA fiduciary duties including the duty to act loyally, prudently, and honestly.

48. Throughout the Class Period, the 401(k) Plan held a significant portion of its assets in the Company Stock Fund. As of December 31, 2006, the 401(k) Plan held

16

$314,407,000 in Macy's common stock, representing approximately 16% of the 401(k) Plan's total assets.

**The May Plan**

49.     The May Plan is administered by Macy's through the Plan Committee. The assets of the May Plan are held in a trust for which The Bank of New York is the Trustee.

50.     The May Plan is a 401(k) voluntary contribution plan for those Macy's employees who became eligible for enrollment through December 31, 2006. As of January 1, 2007, however, the May Plan adopted automatic enrollment for newly eligible employees.

51.     Participants in the May Plan may contribute up to 50% of their salary to the plan. In addition, the May Plan provides for a minimum matching employer contribution by the Company of 33 1/3% of participants' contributions.

52.     The employer contributions made to the May Plan in 2005 and 2006 were contributed in cash directly to the Company Stock Fund. The Trustee immediately used those cash contributions to purchase additional shares of Macy's common stock in the Company Stock Fund.

53.     Participants in the May Plan may only direct their contributions to one of the investment options offered by the plan sponsor and administrator. One of the options for investment of participant contributions is the Company Stock Fund.

54.     Throughout the Class Period, the May Plan invested a significant portion of its assets in the Company Stock Fund. As of December 31, 2006, the May Plan held

17

$650,803,000 in Macy's common stock, representing approximately 48% of the May Plan's total assets.

55. Combining the fair value of investments held in the 401(k) Plan for the year 2005 and in the May Plan for the year 2004, approximately 30% of the Plans' total assets were invested in Macy's common stock.

## DEFENDANTS' FIDUCIARY DUTIES

56. ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA, 404(a), 29 U.S.C. § 1104(a).

### The Duty of Prudence

57. Section 404(1)(a)(B) imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims …."

### The Duty of Loyalty

58. ERISA imposes on a plan fiduciary the duty of loyalty – that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries .

59. The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with

18

an "eye-single" to the interests of the participants and beneficiaries, regardless of any other interests, including those of the fiduciaries themselves or the plan sponsor.

**The Duty to Inform**

60.     The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

61.     Pursuant to the duty to inform, at all relevant times, plan fiduciaries are required under ERISA to furnish certain information to plan participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires the plan's administrator to furnish a Summary Plan Description ("SPD") to participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD and all information contained or incorporated in it constitutes representations in a fiduciary capacity upon which Participants are entitled to rely in determining the identity and responsibilities of fiduciaries under the plan and in making decisions concerning their benefits and the investment and management of plan assets allocated to their accounts.

**The Duty to Monitor Appointed Fiduciaries**

62.     Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries who are appointed. The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.

**The Duty to Investigate And Monitor Investment Alternatives**

19

63. The duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and to continually monitor, the merits of the investment alternatives in the Plan, including employer stock, to ensure that each investment is a suitable option for the Plan.

## The Duty to Disregard Plan Documents When Necessary

64. A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

## DEFENDANTS WERE FIDUCIARIES OF THE PLANS

65. During the Class Period, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

66. During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

67. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(A)(1), 29 U.S.C. § 1102(a)(1). A person is a fiduciary if he is designated a "named fiduciary" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). Additionally, to the extent that a person is delegated responsibilities under the plan or a

20

procedure specified in the plan, he is a named fiduciary under ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).

68.      A person can also be a de facto fiduciary as a result of his authority or control over the plan under the very broad definition of "fiduciary" set forth in ERISA at § 3(21)(A), 29 U.S.C. § 1002(21)(A). A person or entity is a fiduciary where, by his conduct, he engages in fiduciary activities. Thus, those who have discretionary authority over administering or managing the plan or who exercise authority or control over the plan's assets are fiduciaries regardless of the labels or duties that the plan's language assigns to them.

69.      Instead of delegating all fiduciary responsibility for the Plans to external service providers, Macy's chose to internalize this fiduciary function. The Plans are administered by the Plan Committee, which has discretionary authority to manage and control the operation and administration of the Plans and investment of their assets.

**Fiduciary Status of Macy's, its Officers and the Board**

70.      Macy's, through its officers, directors or otherwise, exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets, and is therefore a fiduciary of the Plans.

71.      Macy's acted as a fiduciary in connection with Plans communications. Indeed, Macy's was responsible for disseminating a SPD for the 401(k) Plan and the May Plan to Participants.

72.      Moreover, Macy's was responsible for disseminating to Participants the Plans' prospectuses ("Prospectuses"), which purported to describe the investment

characteristics of the Plans' various investment options. The Prospectuses for the Plans and all information contained or incorporated therein constitute representations disseminated in a fiduciary capacity upon which Participants were entitled to rely in making decisions concerning their benefits and the investment and management of the Plans' assets allocated to their accounts.

73.     Upon information and belief, the Prospectus for the 401(k) Plan also incorporated by reference Macy's filings with the SEC, including but not limited to, annual reports, press releases, Forms 10-K, and Registration Statements.

74.     Upon information and belief, the Prospectus for the May Plan incorporated by reference Macy's filings with the SEC, including but not limited to annual reports, press releases, Forms 10-K, and Registration Statements.

75.     Upon information and belief, Macy's filings with the SEC were part of the SPD and the Prospectus for each of the Plans. Macy's exercised discretion over the contents of the SPDs and the Prospectuses it disseminated, which were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plans.

76.     Under ERISA, Macy's was not required to cause the Plans to offer Macy's common stock as an investment option under the Plans or to incorporate all of Macy's SEC filings into the Plans' documents, but once it elected to do so, it rendered the disclosures contained in the SEC filings disclosures made in a fiduciary capacity.

77.     Upon information and belief, Macy's made direct representations to Participants relating specifically to the Plans' investment options, the business and financial condition of the Company, and the merits of investing the Plans' assets in the

22

Company Stock Fund, and those representations were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plans.

78.     Macy's was also a fiduciary to the extent that the Board and/or its employees served on the Plan Committee. The Plan Committee Defendants were officers and other employees of Macy's who served at the pleasure of the Board without additional compensation. Based on these facts, Macy's had control over the actions of the Plan Committee and its members and is liable for the Plan Committee's actions.

79.     Macy's at all times acted through members of any Company oversight and/or administrative committees of the Plans, including, upon information and belief, the Plan Committee and Investment Manager.

80.     In addition, pursuant to the Trust Agreement with JP Morgan, Macy's was required to furnish the Trustee with any information that Macy's reasonably deemed necessary for the Trustee to perform its duties imposed under the 401(k) Plan or the Trust Agreement.

81.     Macy's had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their activities related to the Plans. Through the Board or otherwise, Macy's had the authority and discretion to hire and terminate said officers and employees. In addition, upon information and belief, Macy's had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plans. Accordingly, the actions of the Plan Committee and/or any other employee fiduciaries are

23

imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

## Plan Committee Defendants' Fiduciary Status

82. As set forth in the Plans' Forms 5500 filed with Department of Labor ("DOL") and the IRS, Macy's and the Plan Committee were the Administrators of the Plans within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1022(16)(A). The Plan Committee is a "named fiduciary" under ERISA § 402(a), 29 U.S.C. § 1102(a).

83. The members of the Plan Committee were fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that each member had discretionary authority and control regarding the administration and management of the Plans and/or the Plans' assets.

84. According to the terms of the Plans, the Plan Committee exercised its discretionary authority in selecting investment options to be offered under the Plans and monitoring the performance of those investments on a "regular basis (*e.g.*, quarterly)." That monitoring included a review of specific risk and risk-adjusted return measures related to all investment options under the Plans.

85. The Plan Committee further exercised its discretionary authority with respect to the Plans by determining or participating in decisions about the substantive content of Macy's SEC filings, which, on information and belief, were incorporated by reference into the SPDs, Prospectuses and Forms S-8 registration statements. Such filings were intended to communicate to Participants information necessary for Participants to manage their retirement accounts under the Plans.

## Additional Fiduciary Aspects of Defendants' Actions/Inactions

24

86.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets ...." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

87.     Further, ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants, which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, participants and beneficiaries. Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan's participants will not be injured.

88.     During the Class Period, upon information and belief, Defendants made direct and indirect communications with Participants, which included statements regarding investments in the Company Stock Fund. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plans documents (including Summary Plans Descriptions and Prospectuses regarding the Plans'/Participants' holdings of Macy's common stock), which incorporated and/or reiterated these statements. These communications were acts of the Plans' administration and Defendants acted as fiduciaries to the extent that they engaged in this activity.

89.     Upon information and belief, Defendants communicated material information necessary for Participants to make informed decisions with respect to the investment of Macy's stock in the Plans, and in an attempt to comply with ERISA Section 404(a)(1)(A) and (B), Defendants referenced and incorporated Macy's SEC filings into documents intended to convey information related to the Plans to Participants. Upon information and belief, Macy's SEC filings were incorporated into Form S-8 registration statements, SPDs, prospectuses and/or other fiduciary communications.

**All of the Defendants Were Co-Fiduciaries**

90.     Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action, pursuant to Rule 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated who were Participants during the Class Period.

92.     The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's Form 5500 filed on October 16, 2006, there were 80,389 participants in the May Plan at the end of 2005. According to the Company's Form 5500 filed on October 12, 2005, there were 103,863 participants in the 401(k) Plan at the end of 2004. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, several hundred thousand members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period.

26

93.     Common questions of law and fact exist as to all members of the Class
and predominate over any questions affecting solely individual members of the Class.
Among the questions of law and fact common to the Class are:

        (a)     Whether Defendants each owed a fiduciary duty to the Plaintiff
and the Class;

        (b)     Whether Defendants breached their fiduciary duties owed to the
Plaintiff and the Class by failing to act prudently and solely in the interests of the
Participants;

        (c)     Whether Defendants violated ERISA; and

        (d)     Whether Plaintiff and members of the Class have sustained
damages and, if so, what is the appropriate measure thereof.

94.     Plaintiff's claims are typical of the claims of the members of the Class
because Plaintiff and the Class members each sustained damages arising from
Defendants' wrongful conduct in violation of ERISA.

95.     Plaintiff will fairly and adequately protect the interests of the Class and
has retained counsel competent and experienced in class action and complex litigation
under federal law. Plaintiff has no interests antagonistic to or in conflict with those of the
Class.

96.     Class action status in this ERISA action is warranted under Fed.R.Civ.P.
23(b)(1)(B) because prosecution of separate actions by individual members of the Class
would create the risk of adjudications with respect to individual members of the Class
that would, as a practical matter, be dispositive of the interests of the other members not

27

parties to the action, or substantially impair or impede their ability to protect their interests.

97.     Class action status is also warranted under the other subsections of Fed.R.Civ.P.23(b) because:

(a)     Prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and

(c)     Questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## FACTS BEARING ON FIDUCIARY BREACHES

### Macy's Acquisition of May

98.     On February 27, 2005, Macy's announced that it had entered into an agreement and plan of merger with May, whereby Macy's would acquire all outstanding shares of May in a deal valued at approximately $11.7 billion.

99.     At the end of the fiscal year 2004, May had operated approximately 500 department stores and 700 bridal and formalwear stores nationwide under the names of Famous-Barr, Filene's, Foley's, Hecht's, Kaufmann's, Lord & Taylor, L.S. Ayres, Marshall Field's, Meier & Frank, Robinsons-May, Strawbridge's, and The Jones Store, as well as 239 David's Bridal stores, 449 After Hours Formalwear stores, and 11 Priscilla of

28

Boston stores. In acquiring May, Macy's intended to integrate the approximately 500 department stores previously operating under the May name into the Macy's division by converting those stores to the Macy's brand.

100. In a press release issued by the Company on February 28, 2005 announcing the acquisition, Lendgren declared, "This is truly an exciting day in American retailing …. Today, we have taken the first step toward combining two of the best department store companies in America." Lendgren added, "For shareholders and employees, joining together means we will be better able to meet competitive challenges in the retail marketplace and better able to realize growth opportunities over the longer term." In a press release issued by the Company on May 11, 2005, Lundgren further stated, "We are more enthusiastic than ever before about the tremendous potential inherent in combining these two retail businesses."

101. In the Proxy Statement filed with the SEC on May 27, 2005, the Company cited, among others, the following significant strategic opportunities and benefits made available to the Company by its acquisition of May:

(a) The merger is expected to create a more efficient, competitive national retailer, with approximately $30 billion in annual revenues…with a total of approximately 1,650 stores in 49 states;

(b) The combined companies should produce cost synergies of approximately $175 million in 2006 and approximately $450 million in 2007; and

(c) The possibility of achieving higher comparable store sales growth as a result of leveraging the combined companies' best people, products and practices and enhanced ability to compete in the retail industry on a national scale.

102. The proposed merger between Macy's and May was completed on August

30, 2005, at which point May was merged with and into Macy's. In its Form 10-Q filed

with the SEC on September 8, 2005, the Company stated:

> The Merger is expected to have a material effect on the Company's consolidated financial position, results of operations and cash flows. May's reported net sales and net earnings for the 26 weeks ended July 30, 2005 were $6,815 million and $93 million, respectively. May's reported total assets and total liabilities (including ESOP preference shares) at July 30, 2005 were $15,069 and $10,168 million, respectively. The Company expects that the Merger will be accretive to its earnings per share in 2007. The Company expects to realize approximately $450 million in annual cost savings by 2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company….The Company expects to add about 330 Macy's locations nationwide in 2006 as it converts the regional department store nameplates acquired through the Merger.

## Inaccurate Statements and Omissions Affecting Investment in the Plans

103. Throughout the Class Period, Macy's and its directors, officers, and employees repeatedly issued materially inaccurate statements that misrepresented the strength of Macy's business and sales growth and failed to disclose Macy's failures with the Integration Process and the higher than expected costs associated therewith. Consequently, Macy's and its directors, officers, and employees failed to disclose that the Company's sales projections were materially overstated and shares of its common stock were trading at artificially inflated prices.

104. On February 8, 2007, Macy's issued a press release titled "Federated's January Same-Store Sales up 8.6%: *Company Raises Earnings Guidance for Fiscal 2006 Fourth Quarter.*" The press release reported in relevant part:

> *The company increased its guidance for earnings* from continuing operations for the fourth quarter of fiscal 2006. Excluding merger integration costs and related inventory valuation adjustments, the company now expects fourth quarter earnings from continuing operations of $1.55

30

to $1.60 per share, compared with previous guidance of $1.40 to $1.50 per share. The revised guidance includes a one-time gain of 6 cents per share related to completion of its debt tender offer, as announced in December 2006.

"January represented a strong finish to our fiscal year, with an outstanding performance in legacy Macy's and Bloomingdale's stores, as well as *continued improvement in sales trends at former May Company locations*," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Sales were stimulated in part by redemption of gift cards sold during the holiday season and the arrival of cold weather in much of the country."

"All in all, 2006 was a great year in which we transformed our company and embraced an extraordinary amount of positive change while *exceeding our initial earnings targets*," Lundgren said. "*This is a testament to the strategy we have put in place and to the strength of our organization. We look forward to this momentum carrying into 2007.*"

*Federated expects same-store sales to increase by 2 percent to 3 percent in February. Beginning in February, Federated's same-store sales will include former May Company locations*, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.

(emphasis added)

105. On February 27, 2007, Macy's issued another press release titled

"Federated Reports Fourth Quarter Earnings of $1.45 Per Diluted Share from Continuing

Operations: *Diluted EPS from continuing operations, excluding merger integration costs*

*and inventory valuation adjustments, is $1.66 - exceeding the company's guidance.*" The

press release stated in relevant part:

Federated Department Stores, Inc. today reported diluted earnings per share from continuing operations of $1.45 for the 14-week fourth quarter of 2006, ended Feb. 3, 2007. This compares with diluted earnings per share from continuing operations of $1.22 for the 13-week period ended Jan. 28, 2006.

Excluding May Company merger integration costs and related inventory valuation adjustments of $177 million ($110 million after tax or 21 cents per diluted share), fourth quarter diluted earnings per share from

continuing operations were $1.66. *This exceeds the company's prior guidance*, provided on Feb. 8, 2007, for earnings of $1.55 to $1.60 per share excluding merger integration costs and related inventory valuation adjustments. *Earnings for the 2006 fourth quarter include a gain of approximately $54 million* ($34 million after tax or 6 cents per diluted share) related to completion of the company's debt tender offer, as previously announced.

(emphasis added)

106. On March 8, 2007, Macy's issued a press release titled "Federated's

February Same-Store Sales Up 1.2%." The press release stated in relevant part:

Federated Department Stores, Inc. today reported total sales of $1.802 billion for the four weeks ended March 3, 2007, essentially flat compared to total sales of $1.800 billion in the same period last year. On a same-store basis, Federated's sales for February were up 1.2 percent. This compares with the company's guidance for a same-store sales increase of 2 percent to 3 percent in February.

"*Sales in February were impacted by a series of snow and ice storms in the eastern half of the U.S.*, including those during the important selling days immediately preceding Valentine's Day. The geographic region that was most affected by adverse weather was the Upper Midwest," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "*Aside from the weather, we were pleased with performance of both the new and legacy Macy's stores.*"

*Federated expects same-store sales in both March and April to increase by 2.5 percent to 4 percent.*

Beginning in February and now ongoing, Federated's same-store sales include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.

(emphasis added)

107. On April 4, 2007, Macy's issued a press release titled "Federated Invests

for Continued Growth in Direct-to-Consumer Businesses." The press release stated in

relevant part:

32

Federated Department Stores, Inc. today announced an additional capital investment of approximately $100 million in 2007-2008 to support continued growth in its direct-to-consumer businesses, including macys.com, bloomingdales.com, Bloomingdale's By Mail, macysweddingchannel.com and bloomingdalesweddingchannel.com. The amount is incorporated in Federated's total capital spending plans, which include $1.2 billion in 2007 and $1.1 billion in 2008.

"*Our online sales continue to grow at a rapid pace as the national expansion of Macy's and Bloomingdale's attracts new customers to our stores, Web sites and catalog,*" said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "In particular, we are seeing exceptional growth in online sales in new Macy's markets such as Illinois, Michigan, Minnesota, Missouri, Oklahoma, Texas and Utah.

"*Currently, we anticipate our direct-to-consumer businesses will grow to more than $1 billion in sales by 2008 from about $620 million in 2006,*" he said. "Supporting this pace of growth requires additional investment so we can scale up the volume of business while enhancing customer service, delivery efficiency and online site functionality."

New investments will include the building of a 600,000-square-foot distribution center in Goodyear, AZ, which will serve primarily as the West Coast shipping point for macys.com. Construction on this facility will begin in spring 2007 and is scheduled for completion in spring 2008. The facility will employ more than 500 full-time associates when completed and fully operational. The Goodyear distribution center is designed to accommodate a future expansion of 400,000 square feet.

Also included in the 2007-2008 capital plan are an expansion of the direct-to-consumer warehouse management system, improvements to the order management system and enhancements to the macys.com Web site to support projected increases in customer traffic.

(emphasis added)

108. On April 12, 2007, Macy's issued a press release titled "Federated's

March Same-Store Sales up 2.3%." The press release stated in relevant part:

Federated Department Stores, Inc. today reported total sales of $2.288 billion for the five weeks ended April 7, 2007, *an increase of 1.5 percent* compared to total sales of $2.255 billion in the same period last year. On a same-store basis, Federated's *sales for March were up 2.3 percent*. This compares with the company's guidance for a same-store sales increase of 2.5 percent to 4 percent in March.

For the year to date, Federated's sales totaled $4.089 billion, *up 0.8 percent from total sales* of $4.055 billion in the first nine weeks of 2006. On a same-store basis, Federated's year-to-date *sales were up 1.8 percent*.

"*March sales fell just short of our expectations in most regions across the country, largely attributable to weakness in home-related merchandise categories,*" said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "*Unseasonably cold weather as new spring merchandise flowed into the stores in the pre-Easter period also contributed to disappointing sales in the month.*"

*Federated continues to expect same-store sales in April to increase by 2.5 percent to 4 percent.* Sales in the first quarter are expected to be at the low end of previous guidance of $6 billion to $6.1 billion.

(emphasis added)

109.    On April 4, 2007, the Company filed a Form 10-K with the SEC, which

stated in relevant part:

The Merger has had and is expected to continue to have a material effect on the Company's consolidated financial position, results of operations and cash flows. The Company was able to realize more than $175 million of cost savings in 2006 and *expects to realize at least $450 million of annual cost savings starting in 2007*, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company with respect to systems, logistics, store operations and credit management, all of which have been substantially completed as of February 2007. *The Merger is also expected to accelerate comparable store sales growth.*

(emphasis added)

110.    The statements contained in ¶¶ 104 through 109 were materially false and

misleading when made because Macy's and its directors, officers and employees failed to

disclose the following: (a) Macy's had materially overstated its projected sales and

earnings for the fiscal year 2007; (b) Macy's could not meet these overstated projections

for the fiscal year 2007; (c) the merger between Macy's and May was plagued by

integration problems; (d) the Integration Process was failing because of increased

34

integration costs and the Company's strategy of reducing the number of coupons sales promotions made available to consumers, particularly to former May customers; (e) the Company's performance, particularly the earnings achieved by former May stores converted into the Macy's division, was being materially impacted by the Integration Process rather than merely by "snow and ice storms" or a "weakness in home-related merchandise categories;" (f) failures in the Integration Process caused Macy's to experience diminished revenue streams, as consumer demand for Macy's brand products from the converted May stores diminished; and (g) that as a result of the above, the Company's fiscal projections were lacking in any reasonable basis when made.

## Participants Begin to Learn of the Fiduciary Breaches Affecting Their Accounts

111. In a May 10, 2007 press release titled "Federated's April Same-Store Sales Down 2.2%," Macy's startled the market by announcing:

Federated Department Stores, Inc. today reported total sales of $1.837 billion for the four weeks ended May 5, 2007, *a decrease of 2.1 percent* compared to total sales of $1.875 billion in the same period last year. On a same-store basis, Federated's *sales for April were down 2.2 percent*. This compares with the company's guidance for a same-store sales increase of 2.5 percent to 4 percent in April.

For the 13-week first quarter and year to date, Federated's sales totaled $5.924 billion, *down 0.1 percent from total sales* of $5.930 billion in the first 13 weeks of 2006. *This is below the company's guidance for first quarter sales* to be in the range of $6 billion to $6.1 billion. On a same-store basis, Federated's year-to-date sales were up 0.6 percent.

"*April sales were disappointing across the country in both new and legacy Macy's stores,*" said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "A major promotional event that was shifted from May last year to April this year did not produce the results we expected."

*Federated expects same-store sales in May to be in the range of flat to down 2 percent,* which reflects the promotional event shift from May into April.

35

(emphasis added)

112.    On May 16, 2007 Macy's further revealed its financial problems in a press

release titled "Federated Reports First Quarter Earnings of 11 Cents Per Diluted Share

from Continuing Operations, up from a Loss of 13 Cents Per Diluted Share Last Year;

Diluted EPS is 16 Cents, Excluding Merger Integration Costs."    In disclosing the

Company's decline in sales growth, Lundgren stated, "Sales in the [first] quarter were

soft, particularly in April." Lundgren added that "sales in the new Macy's locations were

disappointing in the quarter."

113.    Indeed, the press release further reported:

Sales in the first quarter totaled $5.921 billion…compared to sales of
$5.930 billion in the same period last year. *This is below the company's
guidance for first quarter sales* to be in the range of $6 billion to $6.1
billion.

On a same-store basis, the company expects second quarter sales to be flat
to up 2 percent, versus prior guidance of up 1.5 percent to 2.5 percent.
*Earnings per diluted share, excluding merger integration costs, are now
expected to be in the range of 35 to 45 cents, compared with previous
guidance of 40 to 45 cents,* in the second quarter.  The revised second
quarter guidance reflects management's concern about uncertainty in the
economic environment.

(emphasis added)

114.    On May 9, 2007, the day before Macy's initial disclosure of its decline in

sales and its lowered second quarter sales forecast, Macy's common stock closed at

$43.82 per share.  On May 17, 2007, however, after the market had received the news

about Macy's "soft" and "disappointing" sales, Macy's common stock closed at $39.06

per share, a drop of approximately 11% from its May 9 closing price and approximately

17% from its trading high since Macy's announced its agreement and plan of merger with

May on February 27, 2005.

36

115. On August 15, 2007, the Company disclosed additional adverse, material information about its financial condition and the Integration Process which further shocked the market.

116. Macy's revealed that it had posted a second quarter profit that was sharply lower than its original forecast and cut its guidance for the full year 2007. In fact, the Company's second quarter earnings plunged to $74 million, or 16 cents a share, from $317 million, or 57 cents a share, marking a plummet of approximately 65%.

117. Macy's also reported a 77% drop in its fiscal second quarter net income amid year-earlier gains. Sales for the second quarter slipped to $5.89 billion from $6 billion in the second quarter 2006, while same-store sales fell 2.6% in that same period. According to a Wall Street Journal news article dated August 15, 2007, Macy's "also cut its sales forecast for the rest of the fiscal year and sees earnings below analysts' expectations."

118. The Company's plunge in its second quarter sales, net income and full-year projected earnings was attributed to failures in the Integration Process. That same Wall Street Journal news article dated August 15, 2007 stated that Macy's experienced its 77% drop in second quarter net income amid year-earlier gains, "as the company continues to struggle with the acquisition of May Department Stores." The article further explained:

Macy's has been struggling with disappointing results at more than 400 stores it acquired from May in 2005. Most of them were converted to the Macy's brand in September. Shoppers at some of the stores have balked as Macy's eliminated coupons and introduced pricier fashions. Some analysts say J.C. Penny Co. and Kohl's Corp. are stealing more price-conscious customers away from Macy's.

119. A MarketWatch news article dated August 15, 2007 added that, "the company has struggled mightily to integrate the former May Co. stores into the Macy's division, which is now 800 stores." A primary cause of the company's integration struggles was its decision to prohibit the use of coupons and sales promotions that former customers of May stores grew accustomed to while shopping at May brand stores.

120. TheStreet.com also issued a news article on August 15, 2007 that stated in relevant part:

Many analysts had expected stronger earnings as the company neared the anniversary date of its conversion of 400 May store into Macy's, which mostly occurred last September. But Michelle Tan, an analyst for UBS, says Macy's moved too far, too fast to get customers to shift over from May stores.

The company significantly cut back on the promotions that May store customers had been used to.

Instead, 'you essentially ripped out the blanket from under the customers,' Tan says of Macy's.

**'They did a shock to their system.'**

(emphasis added)

121. The MarketWatch article dated August 15, 2007 revealed that, as a consequence of an unsuccessful Integration Process, "Macy's doesn't think it will meet Wall Street's projections."

122. Indeed, Macy's twice cut its earnings forecast for the second quarter of 2007, most recently in July 2007 after posting weaker-than-expected June sales.

123. The Wall Street Journal article dated August 15, 2007 further reported that Macy's now sees fiscal third-quarter sales of $5.9 billion to $6 billion and fourth-quarter sales of $8.8 billion to $9 billion. Combined, the forecast of $14.7 billion to $15 billion

is below the company's May 2007 outlook of $15 billion to $15.3 billion. In addition, third-quarter same-store sales are seen being down 1% to up 1%, with the fourth quarter being flat to up 2%. Macy's prior forecast was second-half growth of 2% to 3.5%. Furthermore, third-quarter earnings, excluding merger costs, are seen coming in between five cents and 10 cents a share, while fourth-quarter earnings are projected to be $1.70 to $1.80 a share. The mean estimates of analysts surveyed by Thomson Financial were for earnings of 19 cents and $1.81, respectively.

124.    An article issued by TheStreet.com on August 15, 2007 added, "Indeed, Macy's still faces a rocky road. The company said it now sees earnings of $2.15 to $2.30 a share, before items, for the full fiscal year. That's below its prior projection of $2.45 to $2.60."

125.    Moreover, the above MarketWatch article stated, "The Merger integration costs for the year are substantially higher than original expectations, ranging now at $150 million and $160 million compared with initial plans for $100 million to $125 million."

126.    This news shocked the market and caused immense losses to the Plans. Shares of Macy's common stock dropped as low as $29.13 per share on August 16, 2007, representing a drop of approximately 34% from May 9, the day before Macy's initially disclosed its decline in sales and its lowered 2007 sales forecasts.

127.    Moreover, on August 16, in response to the Company's reduction in its EPS guidance for fiscal year 2007, analysts at Deutsche Bank Securities reduced their target price for Macy's common stock from $56 per share to $43 per share.

128.    Upon information and belief, the statements made in ¶¶ 104 through 109 were incorporated by reference into the Plans' SPDs and Prospectuses that were

disseminated by the Plans' fiduciaries to Participants and/or made directly to the Participants.

## Defendants Suffered From Conflicts of Interest

129. Several Officer Defendants and Director Defendants did not share in the Plans' losses, however, as they apparently realized the imprudence of their investments in Macy's common stock and sold their own shares before the stock price plummeted.

130. Between the Company's February 27, 2007 announcement of its merger agreement with May and the Company's initial disclosures of their financial problems on May 10, 2007, a number of Officer Defendants and Director Defendants completed unusually large stock sales, selling over five hundred thousand shares of personally held, inflated Macy's common stock for more than $25 million in proceeds. For example:

| Name/Position | Shares Sold Between 2/27/07 and 5/10/07 | Sale Price Per Share | Proceeds |
|---|---|---|---|
| **Lundgren, Terry J.,** Chairman, President and CEO | 131,250 206,600 72,820 45,580 | $71.50 $46.00-$46.31 $46.00-$46.37 $44.48 | $9,384,375 $4,536,000 $3,363,000 $2,027,398 |
| **Hoguet, Karen M.,** Executive VP, and CFO | 22,000 84,000 | $71.24 $44.37 | $1,567,280 $3,727,000 |
| **Levinson, Sara,** Director, member of the Compensation and Management Development Committees | 3,500 3,500 | $46.01 $45.80 | $161,035 $160,300 |
| **Weatherup, Craig E.,** Director and Chairman of the Compensation and Management Development Committees | 1,000 2,000 1,700 300 2,000 | $44.39 $44.38 $44.32 $44.33 $44.30 | $44,390 $88,760 $75,344 $13,299 $88,600 |
| **Total:** | 576,250 | | $25,236,781 |

131. The Company's public filings make clear that a significant percentage of its officer and director compensation is in the form of stock grants or stock option grants.

40

132. Because the compensation of many of the Defendants was significantly tied to the price of Macy's common stock, Defendants had an incentive to keep the Plans' assets heavily invested in Macy's common stock on a regular, ongoing basis. Elimination of Macy's common stock as an investment option would have reduced the overall market demand for Macy's common stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Macy's common stock, resulting in lower compensation for the Defendants.

133. Moreover, keeping the Plans' assets heavily invested in Macy' common stock allowed certain fiduciaries of the Plans to sell their personally held Macy's common stock at artificially inflated prices. *Specifically, as the above chart in ¶ 130 demonstrates, certain fiduciaries collectively sold over $25 million worth of personally held Macy's common stock during the Class Period.* This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Macy's common stock when they became aware of the problems with the Integration Process; they did *not*, however, divest the Plans' investments in Macy's common stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

134. Some Defendants may have had no choice in tying their compensation to Macy's common stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Macy's common stock.

135. These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

## REMEDIES FOR DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES

136.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plans' assets should not have been so heavily invested in the Company Stock Fund. As a consequence of the Defendants' breaches, the Plans suffered significantly losses.

137.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary...who breaches any of the...duties imposed fiduciaries...to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

138.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the plan had been properly administered.

139.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in he amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches

42

alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

140. Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants)

141. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

142. At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

143. Defendants were responsible for the selection, maintenance and monitoring of the Plans' investment options, including the option to purchase and to hold investments in the Company Stock Fund.

144. Defendants exercised discretionary authority and/or control over management of the Plans or disposition of the Plans' assets and were, during the Class Period, responsible for ensuring that investment options made available to Participants were prudent. Defendants were responsible for ensuring that all investments in the Company Stock Fund in the Plans were prudent, and are liable for losses incurred as a result of such investments being imprudent.

43

145. Defendants should have known that throughout the Class Period, Macy's issued false and misleading statements regarding the strength of its business and the success of the Integration Process. Defendants should have further known that Macy's failure to disclose its financial and integration problems artificially inflated the Company's reported sales and revenue, as well as the value of its common stock.

146. Based upon the insider sales of Macy's common stock, the Plans' fiduciaries should have recognized the imprudence of Participants continuing their investments in Macy's common stock.

147. Participants, in contrast, invested in Macy's common stock relying on the Company's financial misstatements and omissions and Defendants' continued offering of Macy's common stock as an investment option under the Plans. Because Defendants never disclosed adverse, material information to Participants, at the time that Participants made such investments, Participants were without knowledge of the facts concerning the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in the Macy's common stock.

148. In direct violation of their duty of loyalty to the Plans and their members, Defendants failed to diverge from the Plans' documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Participants. Defendants, either themselves or through persons they direct or control, blindly followed the Plans' documents and directives, leading to an imprudent result that harmed the Participants.

149. Defendants breached their duties prudently and loyally to manage the assets of the Plans. During the Class Period, upon the exercise of reasonable care,

Defendants should reasonably have known that investment in the Company Stock Fund was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or Company matching contributions to the Plans. During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer the Company Stock Fund as an investment option for the Plans and to direct and approve the Plans' investment in the Company Stock Fund, instead of other investments as permitted by the Plans. Despite the imprudence of any investment in the Company Stock Fund during the Class Period, Defendants failed to take adequate steps to prevent the Plans, and indirectly the Participants, from suffering losses as a result of the Plans' investment in the Company Stock Fund.

150.    Defendants also breached their duty of loyalty by failing to administer the Plans with single-minded devotion to the interests of the Plaintiff and the members of the Class, regardless of Defendants' own interests.

151.    Defendants also breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plans in the exercise of their discretion with respect to the Company Stock Fund as an investment option in the Plans.

152.    As a direct and proximate result of Defendants' breaches of their fiduciary duties owed to the Plaintiff and the Class, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants' are liable.

45

## COUNT II

### Failure to Monitor the Plans and to Provide the Administrator of the Of the Plans and Other Fiduciaries With Accurate Information
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against Macy's, Director Defendants and the Plan Committee)

153.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

154.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A). By virtue of their fiduciary responsibilities, Defendants were bound to monitor the other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plans and their investments.

155.    The Director Defendants maintained discretionary authority and control with respect to appointing the members of the Plan Committee to manage and evaluate investment of the Plans' assets. Accordingly, the Director Defendants breached their duties to monitor and inform by:

(a)    Failing to ensure that the Plan Committee, as a monitored fiduciary, had access to knowledge about the Company's operations, financial results and the status of the Integration Process, as alleged above, which made the Company Stock Fund an imprudent retirement investment;

(b)    Failing to ensure that the Plan Committee appreciated the increased risk posed by the significant investment by rank and file employees in the Company Stock Fund; and

(c)    Failing to disclose to the Plan Committee accurate information about the operations and financial results of Macy's that Defendants reasonably should

46

have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plans should continue to offer.

156.    At the same time, the Plan Committee maintained discretionary authority and control with respect to appointing the Investment Managers to manage, acquire, and dispose of the assets of the 401(k) Plan. Accordingly, the Plan Committee breached its duties to monitor and inform by:

(a)    Failing to ensure that the Investment Managers, as monitored fiduciaries, had access to knowledge about the Company's operations, financial results and the status of the Integration Process, as alleged above, which made the Company Stock Fund an imprudent retirement investment;

(b)    Failing to ensure that the Investment Managers appreciated the increased risk posed by the significant investment by rank and file employees in the Company Stock Fund; and

(c)    Failing to disclose to the Investment Managers accurate information about the operations and financial results of Macy's that Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plans should continue to offer.

157.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

47

## COUNT III

### Failure to Provide Complete and Accurate
### Information to the Plans' Participants and Beneficiaries
### Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### (Against All Defendants)

158. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

159. During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).

160. During the Class Period, Defendants' fiduciary duties bound them to ensure that communications by and about the Plans and their assets were truthful, complete and not misleading, including information concerning the investment options offered under the Plans.

161. Throughout the Class Period, Defendants failed to provide participants in the Plans with complete and accurate information regarding the Company's operations, financial conditions, and Integration Process necessary for participants in the Plans to accurately assess the quality of an investment in the Company Stock Fund. Instead, Defendants conveyed false and misleading material information to the investing public and to the Plaintiff and the Class, regarding the soundness of Macy's common stock and the prudence of investing retirement savings in the Company Stock Fund. Because large percentages of the assets of the Plans were invested in the Company Stock Fund during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

162. Defendants' misrepresentations and omissions were material to the determination of Plaintiff and members of the Class whether investing in or maintaining

48

their investments in the Company Stock Fund was prudent. As such, Plaintiff and members of the Class are presumed to have relied to their detriment on Defendants' misleading statements and omissions.

163. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT IV

### Failure to Act Exclusively in the Interests of the Plans' Participants Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 (Against All Defendants)

164. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

165. During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).

166. Defendants were duty bound to act with undivided loyalties to the Plans, binding them to discharge their responsibilities solely in the interest of Participants and for the exclusive purpose of providing benefits thereto.

167. Defendants breached their duty of loyalty by:

(a) Failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the Company Stock Fund;

(b) Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made the Company Stock Fund an unsuitable investment for the Plans;

49

(c)    Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d)    With respect to each of the failures listed in the preceding sub-paragraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from discovering the Company's financial and operational weaknesses as well as the failures of the Integration Process; and

(e)    By otherwise placing the interests of Macy's and themselves above the interests of the Participants with respect to the Plans' investment in the Company Stock Fund, by among other things, keeping the Plans' assets heavily invested in Macy's common stock when it was imprudent to do so - rather than divesting the Plans' investments in Macy's common stock - while certain fiduciaries sold their personally held Macy's common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plans and the Participants suffered massive losses.

168.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT V

### Co-Fiduciary Liability
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against Officer Defendants, Director Defendants, and the Plan Committee)

169.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

170.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of

50

fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

171. As alleged herein, Macy's, through its officers and employees, such as Officer Defendants, Director Defendants, and the Plan Committee failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices to the detriment of Plaintiff and members of the Class, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, Macy's and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding its materially overstated sales and earnings projections for the fiscal year 2007 and its failures with the Integration Process. Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Macy's common stock as an investment for the Participants' retirement assets.

172. Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plans' investment and holding of Macy's common stock during the Class Period. Defendants did so by themselves making imprudent and disloyal decisions respecting the Plans'

51

investment in Macy's common stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plans' investment in Macy's common stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

173.   In further violation of ERISA § 405(a)(l)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of Macy's financial and integration problems and further concealing such practices from Participants and the market as a whole.

174.   In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants – including any appointed fiduciaries of the Plans – who lacked knowledge of the circumstances rendering Macy's common stock imprudent, by failing to provide such persons with complete and accurate information regarding Macy's common stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plans caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plans' investment in Macy's common stock. In so doing, these Defendants breached ERISA § 405(a)(l)(B).

175. Further, through their failure to properly and effectively monitor their appointees on the Plan Committee and the Investment Managers, and remove those fiduciaries whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed fiduciaries' imprudent management of the Macy's Stock Fund in the Plans.

176. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants, lost a significant portion of their retirement investment.

177. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. 'll09(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

## Prohibited Transactions
## in Violation of ERISA § 406
## (Against All Defendants)

178. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

179. By virtue of all the facts and events alleged herein, Defendants, in connection with their actions and omissions in authorizing and causing the Plans to continue to offer the Company Stock Fund as an investment option during the Class Period and in permitting Plaintiff and members of the Class to invest in the Company Stock Fund at a time when Defendants reasonably should have known that Macy's operational and financial health were deteriorating and the Integration Process was proving unsuccessful – material facts undisclosed or misrepresented to the public – and

53

that as a result, the prices per share at which the Company Stock Fund was acquiring Macy's common stock grossly exceeded fair market value, caused the Plans to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plans and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

180.   Because the prices Defendants caused the Company Stock Fund to pay for such shares were materially, artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

181.   Macy's is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

182.   During the Class Period, Macy's common stock was artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plans to pay artificially inflated prices for the Macy's common stock.

183.   During the Class Period, the Plans invested millions of dollars in both participant and company-matching contributions in Macy's common stock, at artificially inflated prices. The Plans and the Participants thus over-paid for their "participation interests" in the Plans.

184.   Because the Plans' acquisitions of Macy's common stock at artificially inflated prices were prohibited transactions, a *per se* violation of ERISA § 406(a), 29 U.S.C. §1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, on behalf of himself and the members of the Class, seeks to rescind all transactions purchasing shares of the Company Stock Fund.

185. Further, to restore the Plans and their participants and beneficiaries to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plans are entitled to recover the amount that the contributions used to purchase Macy's commons stock for the Company Stock Fund would have earned had such amounts been invested in suitable investment options.

## SECTION 404(c) DEFENSE INAPPLICABLE

186. As a direct or proximate result of Defendants breaches of the fiduciary duties they owed to Plaintiff and members of the Class, the Plans suffered losses, and the Plaintiff and the members of the Class suffered losses when substantial assets in the Plans were invested in the Company Stock Fund during the Class Period.

187. As to contributions invested in the Company Stock Fund, Defendants were responsible for the prudence of investments offered under the Plans unless Participants, themselves, effectively exercised informed control over the assets in the Plans in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated thereunder.

188. Defendants, however, did not comply with those provisions. Rather than taking the necessary steps to ensure effective participant control by complete and accurate disclosure of material information, Defendants did the opposite. As a consequence, Participants did not have informed control over the assets of the Plans that were invested in the Company Stock Fund, and Defendants remained entirely responsible for ensuring that such investments were and remained prudent.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of other members of the Class, prays for judgment as follows:

A.   Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.   Declaring that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class;

C.   Declaring that Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.   Compelling Defendants to reimburse the Plans for all losses thereto, resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the assets of the Plans, and to restore to the Plans all profits Defendants made through the use of the assets of the Plans, and to restore to the Plans all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

E.   Enjoining Defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

F.   Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the individual accounts of Plaintiff and members of the Class in proportion to the losses of those accounts;

G.   Awarding Plaintiff and members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

56

H.      Awarding Plaintiff and members of the Class their costs and expenses in

this litigation, including reasonable attorneys' fees and experts' fees and other costs and

disbursements; and

I.      Awarding Plaintiff and members of the Class such other and further relief

as the Court may deem just and proper.

Dated: October 3, 2007

**KATZ GREENBERGER & NORTON, LLP**

By: _____

Stephen E. Imm
105 East Fourth Street, 4th Floor
Cincinnati, Ohio 45202
Tel: (513) 721-5151
Fax: (513) 621-9285
sei@kgnlaw.com

**HARWOOD FEFFER LLP**

Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq.
488 Madison Ave., 8th Floor
New York, New York 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com

**MILBERG WEISS LLP**

Lori G. Feldman
One Pennsylvania Plaza, 49th Floor
New York, NY, 10119-0165
Tel: (212) 594-5300
Fax: (212) 868-1229
lfeldman@milbergweiss.com

*Attorneys For Plaintiff*

**OF COUNSEL:**

**LAW OFFICE OF ALFRED G. YATES JR., PC**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 391-5164
Fax: (412) 471-1033
yateslaw@aol.com

KGN Word Doc 212944