## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| EBRAHIM SHANEHCHIAN, Individually And On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>           vs.<br><br>MACY'S INC., KAREN M. HOGUET, TERRY J. LUNDGREN, MEYER FELDBERG, SARA LEVINSON, JOSEPH NEUBAUER, JOSEPH A. PICHLER, JOYCE M. ROCHE, KARL M. VON DER HEYDEN, CRAIG E. WEATHERUP, MAMA C. WHITTINGTON, WILLIAM STIRITZ, STEPHEN F. BOLLENBACH, DEIRDRE P. CONNELLY, STEPHEN J. O'BRYAN, ROBERT G. ZIMMER, THE PLAN COMMITTEE FOR THE MACY'S, INC. PROFIT SHARING 401(K) INVESTMENT PLAN AND THE MAY DEPARTMENT STORES COMPANY PROFIT SHARING PLAN, STEPHEN J. O'BRYAN, DAVE CLARK, DICK BRICKSON, R.B. HARRISON, TONY SPRING, RON TYSOE, JIM GRAY and MIKE OSBORN,<br><br>                              Defendants. | Civil Action No. 07CV828<br><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974** |

Plaintiff Ebrahim Shanehchian ("Plaintiff"), individually and on behalf of a class of similarly situated participants and beneficiaries (the "Class") of the Macy's, Inc. Profit Sharing 401(k) Investment Plan (the "401(k) Plan") and the May Department Stores Company Profit Sharing Plan (the "May Plan") (collectively, the "Plans"), alleges the following based upon the investigation of counsel, and upon personal knowledge as to facts pertaining to Plaintiff and on information and belief as to all other facts:

## NATURE OF THE ACTION

1.     This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132, against fiduciaries of the Plans who are and were responsible for the investment of the assets and the administration of the Plans between the dates of February 27, 2005 through and including the present (the "Class Period"). During the Class Period, the Plans' fiduciaries, including Macy's, Inc. ("Macy's" or the "Company") and certain of its senior officers and directors, breached their fiduciary duties owed to the Plans' participants and beneficiaries (collectively, the "Participants"), causing the loss of millions of dollars of Participants' retirement savings.

2.     Plaintiff was a Macy's employee and participant in the 401(k) Plan during the Class Period. As a participant, Plaintiff, like other members of the Class, was entitled to set aside a certain percentage of his annual base salary for investment in various investment options provided by the 401(k) Plan. Similarly, other members of the Class were entitled to set aside a certain percentage of their annual base salary for investment in various investment options provided by the May Plan. Among the investment options in the Plans was the Macy's Stock Fund or Macy's Common Stock Fund (collectively, the "Company Stock Fund") which invested primarily in Macy's common stock.

3.     The Plans have two main components: (a) a component in which Participants make voluntary, pre-tax contributions to the Plans out of their base pay (the "Participant Contribution Component"), and (b) a component in which the Company matches a portion of the Participants' contribution to the Plans (the "Company Match"). Macy's common stock was offered as an investment alternative for Participants and was the sole source of the Company Match.

2

4.      Throughout the Class Period, the Plans invested heavily in Macy's common stock.  The 401(k) Plan held approximately 16% of its total assets in Macy's common stock. The May Plan held approximately 48% of its total assets in Macy's common stock and because the Plans' holdings in Macy's common stock comprised a significant percentage of the overall value of the assets that the Plans held on behalf of the Participants, the long-term retirement savings of Participants were dependent, to a substantial degree, on the performance of Macy's common stock.  So too were Participants' retirement savings dependent on the related need for prudent fiduciary decisions by Defendants, concerning such a large, ongoing investment of the Plans' assets.

5.      On February 27, 2005, Macy's entered into an agreement and plan of merger with The May Department Stores Company ("May").[1]  The merger was completed on August 30, 2005, at which point Macy's acquired nearly 500 May department stores that Macy's intended to convert into Macy's brand stores.

6.      The Plans' fiduciaries knew or should have known that during the Class Period Macy's had made a series of material misrepresentations and omissions regarding the Company's declining sales growth and its failures in converting the newly acquired May stores into Macy's brand stores (the "Integration Process") that caused Macy's common stock to trade at artificially inflated levels.

7.      Although Defendants continued to cause the Plans to hold, and the Participants to acquire Macy's common stock during this time, Company insiders were selling shares of their own Macy's common stock in unusually large amounts.  In fact, as alleged below, several of the

---

[1]      At the time Macy's entered into this agreement and plan of merger with May, Macy's was called Federated Department Stores, Inc., changing its name to Macy's effective June 1, 2007.

3

individual Defendants named herein that were also fiduciaries of the Plans sold more than $19 million of their personally held Macy's common stock despite allowing the Plans and the Participants to acquire and hold Macy's common stock.

8.    Beginning on May 10, 2007, after certain individual Defendants had completed their sales, the Company began to reveal its overstated sales forecasts and failures in the Integration Process. In response to the Company's public disclosures, and on through August 15, 2007 the Company's stock price dropped approximately 34% from a closing price of $43.82 per share on May 9, 2007 to $29.13 per share on August 16, 2007 -- a loss that significantly reduced the overall value of the Plans' assets and Participants' vested retirement benefits.

9.    Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the Participants, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the Class Period as required by ERISA. Defendants breached their fiduciary duties owed to the Plans and the Participants under ERISA by, among other things:

- Selecting and maintaining the Company Stock Fund as an investment alternative under the Plans and permitting the Plans to buy and hold shares of Macy's common stock during the Class Period when it was an imprudent investment;

- Encouraging Macy's employees to invest in the Company Stock Fund;

- Continuing to invest the Company Match in the Company Stock Fund and failing to divest the Plans from shares of Macy's stock when continuing to do so became imprudent as a result of the Company's misrepresentations and omissions regarding its declining sales growth and failures in the Integration Process;

4

- Abdicating their continuing duty to review, evaluate and monitor the suitability of the Plans' investment in the Company Stock Fund;

- Failing to provide accurate, material information to Participants about Macy's financial health and the Integration Process necessary to enable Participants to make informed investment decisions concerning their contributions invested in the Company Stock Fund; and

- Failing to disclose the true and accurate details regarding the fees and expenses of the Plans.

10. As a result of Defendants' breaches of their fiduciary duties, Plaintiff and members of the Class have suffered substantial losses of retirement savings and anticipated retirement income from the Plans. As such, under ERISA, Defendants are obligated to restore to the Plans the losses that resulted from their breaches of their fiduciary duties pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

11. In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

## JURISDICTION AND VENUE

12. This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

5

Macy_s CAC UPDATED

13.     ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States, and this Court therefore, has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of Ohio.

14.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or several Defendants reside or maintain their primary place of business in this district.

## THE PARTIES

**A.**     Plaintiff

15.     Plaintiff Ebrahim Shanehchian is a resident of the State of Texas and is and was at all relevant times a participant in the 401(k) Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  During the Class Period, Mr. Shanehchian held units of the Company Stock Fund in his individual 401(k) Plan account.

**B.**     Defendants

16.     Each of the Defendants named herein are fiduciaries of the Plans within the meaning of ERISA.

### *Macy's*

17.     **Defendant Macy's** is a corporation organized under the laws of Delaware, with its principal executive offices located at 7 West 7th Street, Cincinnati, Ohio 45202.  Macy's, through its subsidiaries, operates department stores, selling a range of merchandise, including men's, women's, and children's apparel, and accessories, cosmetics, home furnishings, and other

6

consumer goods. As of February 2, 2008, the Company operated approximately 850 retail stores in 45 states, the District of Columbia, Guam, and Puerto Rico under the names Macy's and Bloomingdale's. During the Class Period, Macy's common stock traded on the New York Stock Exchange.

18. Under ERISA, an employer who provides a 401(k) plan for its employees is a "Plan Sponsor." The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such. Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan. The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry. ERISA requires that the fees for those services must be reasonable, incurred solely for the benefit of the Plans' participants, and fully disclosed.

19. During the Class Period, Macy's was the Plan Sponsor and Plan Administrator of the Plans and exercised discretionary authority over the Plans, acting through its Board of Directors (the "Board"), its officers, and the Pension and Profit Sharing Committee (the "Plan Committee"). The Plan Committee is appointed by the Board to administer and manage the Plans and/or the Plans' assets. During the Class Period, Macy's was a named and/or *de facto* fiduciary of the Plans. Macy's also had the authority and discretion to appoint, monitor and remove officers and employees that performed fiduciary functions with respect to the Plans, including the Director Defendants (defined below) and the Plan Committee.

### *Macy's Officer Defendants*

20. Defendant Karen M. Hoguet ("Hoguet") was, at all relevant times during the Class Period the Chief Financial Officer and Executive Vice President of Macy's. Hoguet was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority

7

with respect to the management and administration of the Plans, the management and disposition of the Plans' assets, as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans. Hoguet signed the Company's Form 11-Ks filed with the Securities and Exchange Commission ("SEC") during the Class Period. Hoguet also participated in the day-to-day management and overall direction of the Company, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, financial condition, and the Integration Process. As such, Hoguet knew or should have known about the Company's material misrepresentations and omissions which caused Macy's to overstate its sales growth and Macy's common stock to trade at artificially inflated stock prices. Defendant Hoguet served as the Chair of the Plan Committee from February 27, 1992 continuing through the present.

21.     **Defendant Terry J. Lundgren** ("Lundgren") served as the Company's President, Chief Executive Officer, and Chairman of the Board during the Class Period. Lundgren participated in the day-to-day management and overall direction of the Company, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, financial condition, and the Integration Process. Lundgren knew or should have known about the Company's material misrepresentations and omissions which caused Macy's to overstate its sales growth and Macy's common stock to trade at artificially inflated prices. Lundgren was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and the management and disposition of the Plans' assets.

22.     Defendants Hoguet and Lundgren are collectively referred to herein as the "Officer Defendants."

8

### *The Director Defendants*

23.     The business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plans.  One of the Board's many roles or functions is the power to appoint the members of the Plan Committee. Upon information and belief, the Board likewise exercised discretionary authority or discretionary control with respect to the appointment of the Plans' fiduciaries, and with respect to the management of the Plans.  Based on the above, the Board is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority or control with respect to the appointment of other fiduciaries of the Plans.

24.     **Defendant Meyer Feldberg** ("Feldberg") served as a director on the Board during the Class Period.  Feldberg has been a member of the Board since May 1992.  He currently serves as the Vice Chair of the Board's Compensation and Management Development Committee and as a member of the Nominating and Corporate Governance Committee. Feldberg was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

25.     **Defendant Sara Levinson** ("Levinson") served as a director on the Board during the Class Period.  Levinson has been a member of the Board since May 1997.  She currently serves as a member of the Board's Compensation and Management Development Committee and as a member of the Nominating and Corporate Governance Committee.  Levinson was a

9

fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

26. **Defendant Joseph Neubauer** ("Neubauer") served as a director on the Board during the Class Period. Neubauer has been a member of the Board of Macy's since September 1992. He currently serves as the Vice Chair of the Board's Audit Committee and Nominating and Corporate Governance Committee and as a member of the Board's Compensation and Management Development Committee. Neubauer was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

27. **Defendant Joseph A. Pichler** ("Pichler") served as a director on the Board during the Class Period. Pichler has been a member of the Board of Macy's since December 1997. He currently serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Board's Compensation and Management Development Committee. Pichler was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

28. **Defendant Joyce M. Roche** ("Roche") served as a director on the Board during the Class Period. Roche has been a member of the Board of Macy's since February 2006. She

10

currently serves as a member of the Board's Audit Committee and Nominating and Corporate Governance Committee. Roche was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

29. **Defendant Karl M. von der Heyden** ("von der Heyden") served as a director on the Board during the Class Period. Von der Heyden has been a director since February 1992. He currently serves as Chair of the Board's Finance Committee and as a member of the Board's Compensation and Management Development Committee. Von der Heyden was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

30. **Defendant Craig E. Weatherup** ("Weatherup") served as a director on the Board during the Class Period. Weatherup has been a director of the Board of Macy's since August 1996. He currently serves as Chair of the Board's Compensation and Management Development Committee and as a member of the Board's Nominating and Corporate Governance Committee. Weatherup was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

31. **Defendant Mama C. Whittington** ("Whittington") served as a director on the Board during the Class Period. Whittington has been a director on the Board of Macy's since

11

June 1993. She currently serves as Chair of the Board's Audit Committee and as Vice Chair of the Board's Finance Committee. Whittington was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

32.     **Defendant William Stiritz** ("Stiritz") served as a director on the Board at times during the Class Period. Prior to his retirement from the Board in May 2007, Stiritz served as a member of the Board's Audit Committee and Finance Committee. Stiritz was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

33.     **Defendant Stephen F. Bollenbach** ("Bollenbach") served as a director of the Board during the Class Period. Bollenbach became a member of the Company's Board of Directors in 2007. Bollenbach was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to the management and administration of the Plans and the management and disposition of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

34.     **Defendant Deirdre P. Connelly** ("Connelly") served as a director of the Board during the Class Period. Connelly was elected to the Company's Board of Directors effective January 1, 2008. Connelly was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to the management and administration of the Plans

and the management and administration of the Plans' assets as well as the selection of a committee of individuals to serve at the pleasure of the Board to administer the Plans.

35. Defendants Hoguet, Lundgren, Feldberg, Levinson, Neubauer, Pichler, Roche, von der Heyden, Weatherup, Whittington, Stiritz, Bollenbach and Connelly are collectively referenced herein as the "Director Defendants."

### *The Plan Committee Defendants*

36. According to the Macy's Inc. Retirement Benefit Investment Policy Statement, the Board has delegated to the Plan Committee responsibility for the investment of assets including "structuring the overall program with reference to the retirement benefit obligation and the immediate long-term financial prospects of Macy's, Inc.; selecting appropriate asset classes and determining the long-term allocation to each asset class; selecting investment managers; recommending appointment of trustees to the Board of Directors; and monitoring the structure and results of the investment program."

37. The Plan Committee served as the "administrator" and "named fiduciary" of the Plans during the Class Period. The Plan Committee was the principal group responsible for management and evaluation of the investment of the Plans' assets during the Class Period. Members of the Plan Committee were appointed by the Board and included officers and other employees of the Company who participated in managing and administering the Plans (collectively, the "Plan Committee Defendants"). The Plan Committee reports to the Board.

38. According to the Macy's, Inc. Summary Plan Descriptions ("Macy's SPD") the Plan Administrator is responsible for making sure that the Plans operate according to the terms of applicable law and may delegate certain of its responsibilities to other persons or committees.

13

39.     The Macy's SPD states that the "Board of Directors of Macy's, Inc. has appointed a Committee, known as the Pension and Profit Sharing Committee, to act on behalf of the Plan Administrator in carrying out the Plans' administrative duties ... The Plan Administrator and the Pension and Profit Sharing Committee have the complete discretion and authority to decide all matters involving the administration of the Plans."

40.     According to the May Department Stores Company Profit Sharing Plan Notes to Financial Statements Years Ended December 31, 2006 and 2005, as of the merger date, Macy's became the Plan Sponsor and Plan Administrator of the May Plan.

41.     The Federated Department Stores, Inc. Defined Contribution Plans Master Trust Agreement with the Chase Manhattan Bank, N.A., n/k/a The Macy's Inc. Defined Contribution Plan Master Trust Agreement With JP Morgan Chase Bank (the "Master Trust") provides that the Macy's Pension and Profit Sharing Committee "selects a diversified group of investment managers who determine purchases and sales of investments for the respective portions of the assets in the Master Trust managed by them."

42.     **Defendant Stephen J. O'Bryan** ("O'Bryan") is the Operating Vice President of Macy's and served as a member of the Plan Committee during the Class Period. O'Bryan signed the Company's Form 5500 filed with the Internal Revenue Service ("IRS") and the Department of Labor ("DOL") for the 401(k) Plan filed for 2004, 2005 and 2006 as administrator of the 401(k) Plan.

43.     **Defendant Robert G. Zimmer** ("Zimmer") served as a member of the Plan Committee during the Class Period. Zimmer signed the Company's Form 5500 for the May Plan filed for 2006 as the administrator of the May Plan.

14

44. **Defendant Dave Clark** ("Clark") served as a member of the Plan Committee from December 6, 2002 continuing through the present.

45. **Defendant Dick Brickson** ("Brickson") served as a member of the Plan Committee from March 10, 2006 continuing through the present.

46. **Defendant R.B. Harrison** ("Harrison") served as a member of the Plan Committee from June 5, 2007 continuing through the present.

47. **Defendant Tony Spring** ("Spring") served as a member of the Plan Committee from June 5, 2007 continuing through the present.

48. **Defendant Ron Tysoe** ("Tysoe") served as a member of the Plan Committee from May 17, 1996 through March 10, 2006.

49. **Defendant Jim Gray** ("Gray") served as a member of the Plan Committee beginning prior to 1992 through April 3, 2007.

50. **Defendant Mike Osborn** ("Osborn") served as a member of the Plan Committee from December 6, 2002 through April 3, 2007.

51. Defendants O'Bryan, Zimmer, Clark, Brickson, Spring, Tysoe, Gray and Osborn and collectively referenced herein as the "Plan Committee Defendants."

52. The Plan Committee Defendants exercised discretionary authority and discretionary control with respect to the management of the Plans and their assets.

## CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action as a class action, pursuant to Rule 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all others similarly situated who were Plan Participants during the Class Period.

15

54.     The members of the Class are so numerous that joinder of all members is impracticable. According to the Company's Form 5500 filed on October 15, 2007, there were 64,911 participants in the May Plan at the end of 2006. According to the Company's Form 5500 filed on October 15, 2007, there were 125,776 participants in the 401(k) Plan at the end of 2006. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plans and held Macy's common stock during the Class Period in their individual Plan accounts.

55.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     Whether Defendants each owed a fiduciary duty to the Plaintiff and the Class;

        (b)     Whether Defendants breached their fiduciary duties owed to the Plaintiff and the Class by failing to act prudently and solely in the interests of the Participants;

        (c)     Whether Defendants violated ERISA; and

        (d)     Whether Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

56.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the Class members each sustained damages arising from Defendants' wrongful conduct in violation of ERISA.

16

57.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and complex litigation under federal law. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Class action status in this ERISA action is warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by individual members of the Class would create the risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

59.     Class action status is also warranted under the other subsections of Fed. R. Civ. P. 23(b) because:

(a)     Prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and

(c)     Questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## NATURE OF THE PLANS

60.     The Plans are employee benefit plans within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

61.     The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual

17

accounts for Participants and for benefits based solely upon the amount contributed to Participants' accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account. While the Plans are not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plans pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)

A.    The Plan Documents

62.    ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description ("SPD"). The most recent SPD available for the 401(k) Plan is the Macy's, Inc. Profit Sharing 401(k) Investment Plan and Cash Account Pension Plan Summary Plan Descriptions dated 2007 and includes all amendments to the 401(k) Plan through June 1, 2007 (the "401(k) Plan SPD") (attached hereto as Exhibit 1).

63.    Upon information and belief, the most recent SPD available for the May Plan is the May Retirement, Profit Sharing and Company-Paid Life Insurance Plans Summary Plan Descriptions Dated November 2002 (the "May Plan SPD") (attached hereto as Exhibit 2).

64.    According to the May Department Stores Company Profit Sharing Plan Notes to Financial Statements Years Ended December 31, 2006 and 2005, as of the merger date, Macy's became the sponsor and plan administrator of the May Plan.

65.    ERISA and the Internal Revenue Code require that all plans file an Annual Report on Form 5500 with the Department of Labor ("DOL") and the Department of the Treasury ("DOT"). The 401(k) Plan filed Forms 5500 with the DOL and DOT on October 15, 2007 that

18

were signed by Stephen J. O'Bryan. The May Plan filed Forms 5500 with the DOL and DOT on October 15, 2007 that were signed by Stephen J. O'Bryan.

66. According to the Company's Forms 11-K and Forms 5500 filed during the Class Period, Macy's is the sponsor and administrator of the Plans within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

**B.   Descriptions and Provisions of the Plans**

### *The 401(k) Plan*

67. According to the Macy's SPD, the 401(k) Plan "helps you save for retirement and provides you with the opportunity for tax savings and the opportunity to share in the Company's profits. Both you and the Company contribute to the 401(k) Plan, which encourages building personal savings for retirement."

68. According to the Company's website, Macy's describes the 401(k) Plan as "the most enriching form of retirement savings a company can offer."

69. The 401(k) Plan is administered by Macy's through the Plan Committee. According to the 401(k) Plan SPD, the Plan Administrator and the Plan Committee have the complete discretion and authority to decide all matters involving administration of the Plans.

70. The assets of an employee benefit plan, such as the Plans, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the 401(k) Plan were held in trust pursuant to a trust agreement. *See e.g.* January 1, 1996 Trust Agreement entered into between Chase Manhattan Bank, N.A., n/k/a JP Morgan

Chase Bank and Federated Department Stores, Inc. n/k/a/ Macy's, Inc.[2] (attached hereto as Exhibit 3).

71.     According to the Master Trust Agreement, "The Trustee, the [Plan] Committee, the members of the [Plan] Committee, each Investment Manager ... and the Company shall discharge their respective duties with respect to the Trust Fund solely in the interest of the employees of the Employers which have adopted a Plan and their beneficiaries, *and with the care, skill, prudence and diligence under the circumstances* then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of and enterprise of like character and with like aims. [Emphasis added]."

72.     JP Morgan Chase Bank ("JP Morgan"), as "Trustee" of the 401(k) Plan, holds the 401(k) Plan's assets exclusively, and serves as Trustee custodian for the Master Trust under the terms of the Master Trust agreement between Macy's and JP Morgan.

73.     The 401(k) Plan is a "401(k)" voluntary contribution plan whereby plan participants direct the plan to purchase investments from among the available investment options in the plan and allocate them to participants' individual accounts. Participants may only direct their contributions to one of the limited investment options offered by the plan sponsor and administrator. One of the options for investment of participant contributions in the 401(k) Plan is the Macy's Company Stock Fund. Participants may elect to contribute an amount up to 25%

---

[2]     Pursuant to a written amendment to the Trust Agreement, dated June 1, 2007, all references to Federated Department Stores, Inc. within the Trust Agreement and all other applicable Plan Documents were changed to Macy's, Inc.

of their eligible compensation to the 401(k) Plan, up to 50% of which may be invested in the Company Stock Fund.[3]

74.     During the Class Period, the 401(k) Plan was amended to provide for a discretionary matching contribution with a minimum Company contribution necessary to produce a company match of 33-1/3% of a participant's basic savings, when combined with forfeitures. Effective February 22, 2007, a resolution was adopted by the Board authorizing the Company to contribute 3.5% of Net Income (as determined for the Company's tax year that begins during the applicable year of the Plan, and before deduction for any such contribution) as a matching contribution to the 401(k) Plan and the May Plan combined. The total matching contribution shall be allocated equitably between the two plans.

75.     Company contributions are invested directly in the Macy's Common Stock Fund.

76.     Participants are 100% vested in their own contributions and become 20% invested in the Company's contributions after 2 years of service and additional vesting of 20% each year thereafter until fully vested. 100% vesting is also achieved through normal retirement, death, or disability.

77.     According to the Form 11-K filed with the SEC for the 401(k) Plan, effective October 1, 2006, the 401(k) Plan was amended to establish a Macy's Employee Stock Option Plan ("ESOP") within the Company Stock Fund. The ESOP feature "allows members with accounts in the Macy's [Company] Stock Fund to elect to either reinvest employer dividends into their [401(k)] Plan accounts or to receive these dividends in cash each quarter."

---

[3]     Employees are eligible to participate in the 401(k) Plan after one year of service of at least 1,000 hours and after reaching a minimum age of 25.

78. However, the Macy's SPD, which includes all amendments to the 401(k) Plan through June 1, 2007 does not amend the 401(k) Plan to establish an ESOP within the Company Stock Fund. Accordingly, the 401(k) Plan appears to have abandoned the ESOP feature.

79. Notwithstanding, upon information and belief, any portion of the 401(k) Plan that invested in the Macy's Company Stock Fund does not qualify as an employee stock option plan as that term is defined under the Internal Revenue Code ("IRC") because it does not satisfy the numerous requirements set forth in the IRC.

80. Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any portion of the 401(k) Plan be invested in the Macy's Company Stock Fund. The requirement was simply that if a participant in the 401(k) Plan elects to invest a portion of their account in the Macy's Company Stock Fund, then the participant could elect whether to receive dividends in cash each quarter or reinvest employer dividends into their 401(k) Plan accounts. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities and the 401(k) Plan's purported ESOP status does not, in fact, require investment in the Macy's Company Stock Fund at all, or place any constraints on 401(k) Plan fiduciaries forcing them to invest in the Macy's Company Stock Fund.

81. Similarly, the 401(k) Plan could have held one share of Macy's common stock and still have been an ESOP because that "portion" of the 401(k) Plan — the one share — would have been primarily invested in Macy's common stock.

82. Finally, even if the portion of the 401(k) Plan invested in the Macy's Company Stock Fund constituted an ESOP, the 401(k) Plan's fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspects of investment of qualified employer securities in an ESOP, the 401(k) Plans'

22

fiduciaries remain bound by their other core ERISA fiduciary duties including the duty to act loyally, prudently and honestly.

83.     Throughout the Class Period, the 401(k) Plan held a significant portion of its assets in the Macy's Company Stock Fund. As of December 31, 2006, the 401(k) Plan held $314,407,000 in Macy's common stock, representing approximately 16% of the 401(k) Plan's total assets.

### The May Plan

84.     The May Plan is administered by Macy's through the Plan Committee. The assets of the May Plan are held in trust by The Bank of New York ("BNY").

85.     The May Plan is a 401(k) voluntary contribution plan for those Macy's employees who became eligible for enrollment through December 31, 2006. As of January 1, 2007, however, the May Plan adopted automatic enrollment for newly eligible employees.

86.     According to the May Plan SPD, the May profit sharing plan is "designed to provide long-term financial opportunities...[and] its features make it one of the most attractive investment plans available to May associates."

87.     Participants in the May Plan may contribute up to 50% of their salaries in the Plan. In addition, the May Plan provides for a minimum matching employer contribution by the Company of 33 1/3% of participants' contributions.

88.     The employer contributions made to the May Plan in 2005 and 2006 were contributed in cash directly into the Company Stock Fund. BNY, as trustee, immediately used those cash contributions to purchase additional shares of Macy's common stock in the Company Stock Fund.

23

89.     Participants in the May Plan may only direct their contributions to one of the investment options offered by the plan sponsor and administrator.  One of the options for investment of participant contributions is the Company Stock Fund that invests primarily in Macy's Common Stock (the "May Plan Common Stock Fund").

90.     Throughout the Class Period, the May Plan invested a significant portion of its assets in the May Plan Common Stock Fund.  As of December 31, 2006, the May Plan held $650,803,000 in Macy's common stock, representing approximately 48% of the May Plan's total assets.

91.     Combining the fair value of investments held in the 401(k) Plan for the year 2005 and in the May Plan for the year 2004, approximately 30% of the Plans' total assets were invested in Macy's common stock.

92.     According to the 2002 SPD employees over 21 years of age who have been employed for one year and are paid for 1,000 hours or more are automatically members of the May Retirement Plan and become 100% vested after five years of service.

93.     Membership in the May Profit Sharing Plan is voluntary and is open to all May Retirement Plan members.  Member accounts are 100% vested at all time and Company accounts (accounts which reflect May's matching allocations to the Plan and related earnings and investment gains or losses) become 100% vested after six years or more of service.[4]

94.     According to the 2002 May SPD, employees may generally make "matchable" contributions of up to 5% of annual pay, determined on a paycheck by paycheck basis.  According to the SPD, the annual company match is determined by "the base matching rate,

---

[4]     Company accounts are 20% vested after two years of service, 40% vested after three years of service, 60% vested after four years of service, 80% vested after five years or more of service, and 100% vested upon six years of more of service, or death, disability or retirement.

24

which is based on the company's earnings per share and performance; and the number of ESOP preferred shares which are available to be allocated to your Company Accounts."

95.     According to Macy's 2006 Form 11-K filed with the SEC, on August 30, 2005, in accordance with the merger agreement, each share of May common stock in the May Plan's May Common Stock Fund and May ESOP Preference Fund were converted into .3115 shares of Macy's common stock and $17.75 in cash. The Macy's common stock and cash received were then automatically transferred into the May Plan Common Stock Fund.

96.     Prior to the merger, May was the sponsor and administrator of the May Plan. As of the merger date, Macy's became the sponsor and plan administrator.

97.     Upon the conversion of May stock to shares of Macy's common stock and cash, the May Plan received, upon information and belief, hundreds of millions of dollars in cash in exchange for the May common stock and May ESOP Preference Fund shares in the May Plan.

98.     Immediately following the merger, BNY began purchasing additional shares of Macy's common stock with the hundreds of millions of dollars in cash received by the May Plan in the conversion. Upon information and belief, participants in the May Plan had no choice in having the cash received as a result of the merger used to purchase additional shares of Macy's common stock.

## DEFENDANTS' FIDUCIARY STATUS

**A.     The Nature of Fiduciary Status**

99.     ***Named Fiduciaries.*** ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29

U.S.C. § 1002(16)(A).

100. *De Facto Fiduciaries*. ERISA treats as fiduciaries not only persons explicitly names as fiduciaries under ERISA § 402(a)(1) but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

101. Each of the Defendants was a fiduciary with respect to the Plans and owed fiduciary duties to the Plans and the Participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

102. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plans, as well as the Plans' investments, solely in the interest of the Participants. As fiduciaries, Defendants were required to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

103. Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent fiduciary discretion and authority were assigned to or exercised by each of them, and as further set forth below, the claims against each Defendant are based on such

26

specific discretion and authority.

104.    ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all fiduciaries of the Plans were obliged, when wearing their fiduciary hat(s), to act independently of Macy's which had no authority under the governing Plan documents to direct the conduct of any of them with respect to the Plans, investments therein, or the disclosure of information between and among fiduciaries or from fiduciaries to the Participants.

**B.    Macy's**

105.    As set forth above, Macy's is responsible for appointing, removing and monitoring the Committee, the Plans' Trustee and any and all other persons to whom it assigned fiduciary responsibility.

106.    As Plan Administrator, the Committee has discretionary authority to determine all matters relating to eligibility, coverage, and benefits under the Plans.

107.    Through the Director Defendants and the Committee Defendants, Macy's, at all applicable times, exercised control over the activities of its officers and employees that performed fiduciary functions with respect to the Plans.  The Company could hire, terminate and replace such employees at will.  Macy's is therefore responsible for the activities of its officers and employees through principles of agency and *respondeat superior* liability.

108.    As a matter of corporate law, Macy's is imputed with the knowledge that the Defendants, including Defendants Lundgren and Hoguet, had of the misconduct alleged herein, even if not communicated to Macy's.

27

109.    In light of the foregoing duties, responsibilities and actions, Macy's was a fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control with respect to the management of the Plans, exercised authority or control with respect to the management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

110.    Macy's, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, the Company relied on and continues to rely directly on the Board and the members of the Committee to carry out its fiduciary responsibilities under the Plans and ERISA.

## C.    Director Defendants

111.    Under Ohio law and the Macy's charter and bylaws, the Macy's Board had the authority to manage the business and affairs of Macy's. Because the Company was, as alleged above, a fiduciary of the Plans during the Class Period, thus so were the Director Defendants who, as members of the Board, had the ultimate authority for the affairs of Macy's. In particular, Macy's, as alleged above, had the authority to select the members of the Committee (which, in turn, had the authority to prudently select, suspend, eliminate and/or reduce investment funds, including the Macy's Stock Fund, in the Plans) as well as appoint, remove and monitor the members of the Committee.    Only the Director Defendants can duly exercise these responsibilities.

112.    Consequently, in light of the foregoing duties, responsibilities and actions, the Director Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or

28

discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**D.    Committee Defendants**

113.    As set forth in the Plans' documents, the Director Defendants appointed the members of the Committee to monitor the investments in the Plans, including Company Stock. The Committee Defendants thus had the following duties: to comply with the Policy guidelines and objectives, to select investment managers, to meet with the investment managers to review their investment results and take appropriate action if the investment managers fail to perform as expected and to monitor the legal and regulatory issues applicable to the Policy.

114.    The Committee Defendants made recommendations regarding the Plans' investment options, including the Company Stock Fund, on behalf of the Company and the Plan.

115.    The Committee Defendants had the responsibility to provide complete and accurate information to Participants about the investment offerings in the Plans.

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

116.    ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plans. The goal of ERISA is to protect the interests of a plan's participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

29

117.    Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to a plan's participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of a plan's management.

118.    ERISA imposes on Defendants, who are responsible for the Plans, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

119.    ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring the Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." ERISA § 404(a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

120.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plans' assets, include but are not limited to:

      1.    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plans' assets;

      2.    The duty to evaluate all investment decisions with "an eye single" to the interests of the Participants;

30

3.    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to Participants demanded of them as fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

4.    The duty, under appropriate circumstances, to monitor or influence the management of the companies in which the Plans own stock including, where appropriate, the obligation to bring a derivative action if the fiduciaries were or should have been aware that the officers and directors of the entities whose stock was held by the Plans had breached fiduciary duties owed their shareholders;

5.    To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named;

6.    The duty to disclose and inform of any material adverse information about the Company which duty entails, among other things: (1) a duty not to make materially false and misleading statements or misinform the Participants; (2) an affirmative duty to inform the Participants about material adverse factors which were affecting the Company any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; (3) a duty to convey complete and accurate information material to the circumstances of the

31

Participants and their beneficiaries; (4) a duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price which renders it improbable that the investments will bring a fair return commensurate with the prevailing rates; and (5) a duty to diversify the Plans' investments to minimize the risk of large loss to the Plans and the Participants;

7.     When a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to Participants material information which the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment; and

8.     The duty to diversify and/or cause the Plans' investments to be diversified in order to minimize the risk of large losses.

121.   ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional conception of a fiduciary, absent formal discovery it is impossible to know which fiduciaries exercised which fiduciary functions.

122.   Insofar as the Plans were not properly diversified funds and therefore more risky to the Participants, the Defendants had heightened fiduciary duties to the Participants with respect to the Plans' investment in Macy's Stock, including heightened duties to disclose all

32

material information relevant to investments in Macy's Stock.

### *ERISA Requires the Disclosure of the Plans' Fees and Expenses*

123.    ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Participants a summary plan description.

124.    ERISA § 104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least provide annually to Participants copies of statements and schedules from the Plans' annual reports for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

125.    ERISA § 103(b)(3), 29 U.S.C. § 1023(b)(3), requires that the schedules and statements that the Plan Administrator annually must provide to Participants specifically include:

   a.    [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and

   b.    [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

126.    ERISA § 103(b)(2) & (3), 29 U.S.C. § 1023(b)(2) & (3) mandates that, among other extensive disclosures, Macy's, as a Plan fiduciary, must include in the Plans' "Annual Report":

   a statement of [the Plans'] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

127.    ERISA 404(c) provides to the Plans' fiduciaries a "safe harbor" from liability for losses that a participant suffers in their 401(k) accounts to the extent that the participant exercises control over the assets in their accounts.  To be eligible for the protection of this safe harbor, Macy's as a fiduciary, must, among other things, have provided:

33

a.  an opportunity for a participant or beneficiary to exercise control over assets in his individual account; and

b.  a participant or beneficiary an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are vested.

29 C.F.R. § 2550.404c-1(b)(1).

128.  For a Participant to have "an opportunity to exercise control over assets in his individual account," the Plans' fiduciaries must provide him with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the Plan." 29 C.F.R. § 2550.404c-1(b)(2)(B). The sufficient information must have provided:

A description of any transaction fees and expenses which affect the participant's beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g. commissions, sales load, deferred sales charges, redemption or exchange fees).

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(v). At least upon request, it must include

A description of the annual operating expenses of each designated investment alternative (e.g. investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(i).

129.  ERISA's safe harbor regulations state that the imposition of reasonable charges for reasonable Plan expenses does not interfere with a participant's opportunity to exercise control over his or her individual account so long as Plan fiduciaries inform the participant of such actual expenses:

A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their individual accounts.

29 C.F.R. § 2550.404c-1(b)(2)(ii)(A).

34

130. Moreover, there are numerous ways in which services are provided to employee benefit plans and in the way service providers are compensated. However, given the complexity of the services and compensation arrangements, it is difficult for plan participants to understand what a plan actually pays for the specific services rendered and the extent to which compensation arrangements among service providers present potential conflicts of interest that may affect not only administrative costs, but the quality of services provided.

131. Despite these complexities, section 404(a)(1) of ERISA requires plan fiduciaries, when selecting or monitoring service providers, to act prudently and solely in the interest of the plan's participants and beneficiaries and for the exclusive purposes of providing benefits and defraying reasonable expenses of administering the plan. Fundamental to a fiduciary's ability to discharge these obligations is the availability of information sufficient to enable a participant to make informed decisions about their investment selections based on the services, the costs, and the service provider. In this regard, the Department of Labor has published interpretive guidance concerning the disclosure and other obligations of plan fiduciaries and service providers under ERISA. See, e.g., Field Assistance Bulletin 2002-3 (November 5, 2002) and Advisory Opinions 97-16A (May 22, 1997) and 97-15A (May 22, 1997).

132. In addition to technical guidance, the DOL makes available on its website various materials intended to assist plan fiduciaries and others in understanding their obligations, the importance of fees, and the assessment of service provider relationships. See http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html and http://www.dol.gov/ebsa/newsroom. The DOL's website also provides a Model Plan Fee Disclosure Form to assist fiduciaries of individual account pension plans when analyzing and comparing the costs

35

associated with selecting service providers and investment products. See http://www.dol.gov/ebsa/pdf/401kfefm.pdf.

## FACTS BEARING ON FIDUCIARY BREACHES

133. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plans. The Defendants breached their duties to prudently and loyally manage the Plans' assets because during the Class Period Defendants knew or should have known that Company Stock was not a prudent investment for the Plans. Defendants knew or should have known that the value of Company Stock was artificially inflated during the Class Period, creating an unacceptable risk of loss. Defendants failed to take adequate steps to prevent the Plans, and indirectly the Participants, from suffering losses as a result of the Plans' investment in Company Stock. Throughout the Class Period, Defendants continued to accept the Company matching contributions in Company Stock, instead of in a prudent retirement investment.

134. During the Class Period, the Plans were heavily loaded with Company Stock. One hundred percent of Macy's matching contributions were made in the form of Macy's Stock. Macy's Stock amounted to 48% and 49% of the May Plan's assets at year-end 2005 and 2006, respectively, and Macy's Stock amounted to 13% and 16% of the 401(k) Plan's assets at year-end 2005 and 2006 respectively. This investment strategy was imprudent. When information emerged publicly in May 2007 concerning problems with the integration process and decreasing same-store sales Macy's Stock fell by approximately seventeen percent and continued to drop another 34% by October 2007, causing millions of dollars in losses to the Plans.

36

## A.    Macy's Acquisition of May

135.    At the end of the fiscal year 2004, May had operated approximately 500 department stores and 700 bridal and formalwear stores nationwide under the names of Famous-Barr, Filene's, Foley's, Hecht's, Kaufmann's, Lord & Taylor, L.S. Ayres, Marshall Field's, Meier & Frank, Robinsons-May, Strawbridge's, and The Jones Store, as well as 239 David's Bridal stores, 449 After Hours Formalwear stores, and 11 Priscilla of Boston stores.

136.    On February 27, 2005, Macy's announced that it had entered into an agreement and plan of merger with May, whereby Macy's would acquire all outstanding shares of May. The aggregate purchase price for the May acquisition was approximately $11.7 billion, including approximately $5.7 billion of cash and approximately 200 million shares of Macy's common stock, and options to purchase an additional 18.8 million shares of Company common stock valued at approximately $6.0 billion in the aggregate.    The Company also assumed approximately $6.0 billion of May's debt.

137.    In acquiring May, Macy's intended to integrate the approximately 500 department stores previously operating under the May name into the Macy's division by converting those stores to the Macy's brand.

138.    During 2005 and 2006, Macy's reported that the merger of May/Macy's operations resulted in approximately $822 million of "integration costs," including inventory write-offs.  An additional $125 million in merger related costs were expected to be incurred during fiscal 2007. The Company has also reported that the "consolidation of central functions, division integrations and the adoption of best practices across the combined companies" was expected to result in $450 million in annual cost savings starting in 2007.  Approximately 6,200

37

May divisional and corporate jobs were expected to be eliminated as a result of merger and consolidation process.

139.    According to the Company's Form 10-K filed with the SEC on April 1, 2008, integration costs for 2007 amounted to $219 million. Approximately $121 million of these costs relate to impairment charges in connection with store locations and distribution facilities planned to be closed and disposed of, including $74 million related to nine underperforming stores identified in the fourth quarter 2007 for closure.

140.    Despite the costs associated with the integration, Macy's promised to make old May stores more profitable by toning down promotional sales programs, such as coupons and adding more expensive merchandise and designer goods.   Throughout the Class Period, Defendants provided positive sales guidance reassuring the market and thereby the Plans' participants that former May customers were accepting the conversion, and that integration efforts were succeeding.

141.    In a press release issued by the Company on February 28, 2005 announcing the acquisition, Defendant Lundgren declared, "This is truly an exciting day in American retailing . . . . Today, we have taken the first step toward combining two of the best department store companies in America." Defendant Lundgren added, "For shareholders and employees, joining together means we will be better able to meet competitive challenges in the retail marketplace and better able to realize growth opportunities over the longer term." In a press release issued by the Company on May 11, 2005, Defendant Lundgren further stated, "We are more enthusiastic than ever before about the tremendous potential inherent in combining these two retail businesses."

142.    In the Proxy Statement filed with the SEC on May 27, 2005, the Company cited, among others, the following significant strategic opportunities and benefits made available to the Company by its acquisition of May:

(a)    The merger is expected to create a more efficient, competitive national retailer, with approximately $30 billion in annual revenues . . . with a total of approximately 1,650 stores in 49 states;

(b)    The combined companies should produce cost synergies of approximately $175 million in 2006 and approximately $450 million in 2007; and

(c)    The possibility of achieving higher comparable store sales growth as a result of leveraging the combined companies' best people, products and practices and enhanced ability to compete in the retail industry on a national scale.

143.    The proposed merger between Macy's and May was completed on August 30, 2005, at which point May was merged with and into Macy's.  In its Form 10-Q filed with the SEC on September 8, 2005, the Company stated:

> The Merger is expected to have a material effect on the Company's consolidated financial position, results of operations and cash flows.  May's reported net sales and net earnings for the 26 weeks ended July 30, 2005 were $6,815 million and $93 million, respectively.   May's reported total assets and total liabilities (including ESOP preference shares) at July 30, 2005 were $15,069 and $10,168 million, respectively.  The Company expects that the Merger will be accretive to its earnings per share in 2007.  The Company expects to realize approximately $450 million in annual cost savings by 2007, resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company . . . .   The Company expects to add about 330 Macy's locations nationwide in 2006 as it converts the regional department store nameplates acquired through the Merger.

144.    Sales growth had declined moderately at Macy's throughout 2006, but on February 8, 2007, Macy's reported that fourth quarter earnings would be $1.60 per share, as compared to the Company's prior guidance of $1.50 per share, and forecast a 2% to 3% rise in

39

February 2007 same-store sales-- which would be the first same-store sales figures to include the more than 400 former May stores which Macy's had converted to the Macy's name in September 2006. In response to this announcement, the price of Macy's stock increased from $40.88 per share on February 7, 2007 to $42.42 per share on February 8, 2007.

145. From that time onward, continuing until May 10, 2007 -- when Macy's first revealed that the re-branding of the former May stores was a failure -- the price of Macy's stock continued to increase as the Company reported positive operating trends, causing Company stock to trade at inflated prices, all the while concealing from the market and the Plans' participants that the re-branding of former May stores was ill-received and caused a substantial slow-down in sales.

**B.    Failures of the Integration and Declining Sales at the Former May Stores**

146. The exuberance regarding the integration that Macy's portrayed to the market and the Plans' participants was dependent upon the unrealistic assumption that the May customer base would be absorbed completely, and simply added to the existing Macy's customer base to create sales volume. In reality, many of the former May customers chose to shop at JCPenney's and Target, stores with more mid-range merchandise closer in line with the preferences of the May customer base than the Macy's customer base.

147. Macy's post-merger sales projections also double-counted overlapping Macy's and May customers.

148. In addition, despite the fact that the Company touted the prospects of the merger upon its fruition, it was not until six months or more after the merger was completed that Macy's actually began the process of integration, comparing benefits plans and "talent mining." Upon information and belief, for six to nine months after the official consummation of the merger in

August 2005, there was very little, if any, effort to consolidate operations and it became apparent to insiders as early as the fall of 2005 that sales were dipping.

149. When making sales projections for former May stores (the "Sales Plan"), Macy's disregarded market studies. Sales Plans are normally the most conservative of forecasts. However, the actual performance at former May stores was 4 to 5% lower than even the Sales Plan. In fact, no former May store since the merger has even come close to its Sales Plan number set by Macy's.

150. On a countrywide basis, former May customers were rejecting merchandise brought to the store after the merger because it was of an unknown quality and quantity and was not priced correctly for the market.

151. For example, 10 to 15% of the customer base at an Ohio store was lost because Macy's management wanted to create floor space by eliminating brands which were familiar to the regular May customer base and replaced those brands with unknown brands that the May customer was rejecting.

152. The Company experienced significant problems associated with the merger that Defendants knew or should have known were affecting sales. There were shortfalls in personnel in former May Stores following the merger, and former May store managers were given different responsibilities. Under the Macy's regime, for example, there were no operations or personnel managers in each store. Thus, these positions became regional positions, leaving sales associates without anyone to fix immediate problems. Customer service and consequently, sales at the former May stores suffered dramatically.

153. In addition, Defendants knew or should have known that former May customers were rejecting the changes imposed by the merged entities. The May customer base depended

41

heavily upon discount coupons. Sales in former May stores were directly tied to coupon merchandising, which Macy's drastically decreased following the merger. Macy's practice of downgrading coupon merchandising and imposing higher-end merchandise on what had been a mid-range market caused former May customers to take their business elsewhere post-merger.

## C.  Macy's Assures the Market That the Integration Process is "On Track"

154.  Throughout the Class Period, Macy's and its officers and directors repeatedly issued materially inaccurate statements that misrepresented the strength of Macy's business and sales growth, and failed to disclose Macy's failures with the Integration Process and the higher than expected costs associated therewith. Consequently, Macy's and its officers and directors misled the public and the Participants regarding the overall health of the Company by failing to disclose that the Company's sales projections were materially overstated and shares of its common stock were trading at artificially inflated prices.

155.  Throughout 2006, Defendants repeatedly reported that the Integration Process was proceeding as planned and was "on track." During a November 8, 2006 conference call Defendant Hoguet touted the re-branding efforts which converted old May stores to new Macy's stores as a success stating in pertinent part as follows:

> The third quarter was a big one for us. September 9th marked the culmination of all the hard work and effort that went into preparing all of the former May doors to be converted to Macy's. *The brand launch was very successful and we are very proud of what we accomplished in the first year of owning the May Company.*

> While we would have like to have seen more progress in the performance of our new Macy's or former May doors post-launch, we did see a lot of progress and reason to be confident about the future...*Customers in the former May doors responded well to our private brands and the market goods that were more interested and differentiated.*

[Emphasis added]

42

156.    After having proclaimed the merger a success, Macy's raised earnings guidance for the fiscal 2006 fourth quarter and proceeded to issue a series of optimistic press releases in the beginning months of 2007 that painted a rosy picture of the merged Company's prospects and highlighted purported positive developments of the merged Company, all the while concealing from the market and Participants the serious integration problems that jeopardized the overall health of the Company.

157.    On February 8, 2007, Macy's issued a press release titled "Federated's January Same-Store Sales up 8.6%: *Company Raises Earnings Guidance for Fiscal 2006 Fourth Quarter*." The press release reported in relevant part:

> ***The company increased its guidance for earnings*** from continuing operations for the fourth quarter of fiscal 2006... "January represented a strong finish to our fiscal year, with an outstanding performance in legacy Macy's and Bloomingdale's stores, as well as ***continued improvement in sales trends at former May Company locations,***" said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "All in all, 2006 was a great year in which we transformed our company and embraced an extraordinary amount of positive change while ***exceeding our initial earnings targets,***" Lundgren said. ***"This is a testament to the strategy we have put in place and to the strength of our organization. We look forward to this momentum carrying into 2007."***

(Emphasis added).

158.    On February 27, 2007, Macy's issued another press release titled "Federated Reports Fourth Quarter Earnings of $1.45 Per Diluted Share from Continuing Operations: *Diluted EPS from continuing operations, excluding merger integration costs and inventory valuation adjustments, is $1.66 - exceeding the company's guidance*." The press release stated that fourth quarter earnings per share exceeded the Company's forecast and boasted that earnings for the 2006 fourth quarter included a gain of approximately $54 million.

159.    Despite enormous problems with Integration Process, Macy's continued to reassure the market and Participants regarding the merger, and the continued viability of

43

Company stock. On February 27, 2007 Defendant Hoguet participated in a conference call with financial analysts, in which she discussed Macy's fourth quarter 2006 sales results. Hoguet noted "that the trend in [former May stores] has improved." In response to analysts' questions, Defendant Hoguet also stated that the trend was continuing through February, the first month of Macy's fiscal year 2007:

> [ANALYST]: Just to follow up from the former May doors. Can you give us some color on the degree of improvement as you proceeded through the fourth quarter? And is it possible to give us some measure, whether it's relative to plan or relative to last year, just a sense of how much they have improved and what you think--?
>
> KAREN HOGUET: Let's just say they have improved enough that **we're comfortable giving you the guidance we're giving you for the first quarter**.
>
> [ANALYST]: Okay. And the biggest drivers for the improvement, was it home or execution?
>
> KAREN HOGUET: It was across the board. That's why I said earlier I really do think it's time that elapsed and given customers and associates time to get used to the change.
>
> *   *   *
>
> [QUESTION]: You had mentioned that the comp trend at the May Company doors has been improving since mid December. Does that include February month to date? If it does, is the rate of improvement in February consistent with what you've seen in January as you transition from more full-priced sales?
>
> KAREN HOGUET: **It does include February** but I'm not going to say a lot about February sales until next week.
>
> MICHELLE CLARK: Okay, so it does include February.

[Emphasis added].

160. The statement referenced in ¶159 above that "it does include February" was materially false and misleading because as Defendant Hoguet has now admitted, sales at the former May stores were weak in February and March, and therefore it was materially misleading to represent that comp trends were improving.

44

161. On March 8, 2007, Macy's issued a press release reassuring the market that the merger was proceeding on track and that any shortfall in sales was attributable to bad weather, titled "Federated's February Same-Store Sales Up 1.2%." The press release stated that Company sales for the four weeks ended March 3, 2007 were flat compared to sales in the same period the prior year. Further, it stated that same store sales were up 1.2%, lower than the 2 to 3% expected increase but that "sales in February were impacted by a series of snow and ice storms in the eastern half of the U.S." and that "[a]side from the weather, we were pleased with the performance of both the new and legacy Macy's stores." The press release also stated that the Company expected same store sales in March and April to increase by 2.5% to 4%.

162. On April 4, 2007, Macy's issued a press release emphasizing growth in online sales and Company expansion, titled "Federated Invests for Continued Growth in Direct-to-Consumer Businesses." The press release announced an additional capital investment of approximately $100 million in 2007-2008 to support growth in direct-to-consumer businesses including store websites. In the release, Defendant Lundgren stated that "online sales continue to grow at a rapid pace as the national expansion of Macy's and Bloomingdale's attracts new customers to our stores, web sites and catalog ... Currently, we anticipate our direct-to-consumer businesses will grow to more than $1 billion in sales by 2008 from about $620 million in 2006 ... ."

163. On the same day, the Company filed its Form 10-K with the SEC, which stated in relevant part:

> The Merger has had and is expected to continue to have a material effect on the Company's consolidated financial position, results of operations and cash flows. The Company was able to realize more than $175 million of cost savings in 2006 and *expects to realize at least $450 million of annual cost savings starting in 2007,* resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined company with respect to

45

systems, logistics, store operations and credit management, all of which have been substantially completed as of February 2007. *The Merger is also expected to accelerate comparable store sales growth.*

(Emphasis added).

164. Despite sales falling short of expectations, the Company continued to issue positive press releases in which Defendant Lundgren repeatedly reassured the market and Participants that sales growth would increase, stating that lower than expected sales growth was attributable to bad weather rather than failures of the integration process. On April 12, 2007 the Company issued a press release entitled "Federated's March Same-Store Sales up 2.3%," in which Defendant Lundgren was quoted stating:

> March sales fell just short of our expectations in most regions across the country, largely attributable to weakness in home-related merchandise categories. Unseasonably cold weather as new spring merchandise flowed into the stores in the pre-Easter period also contributed to disappointing sales in the month.
>
> Federated continues to expect same-store sales in April to increase by 2.5 percent to 4 percent. Sales in the first quarter are expected to be at the low end of previous guidance of $6 billion to $6.1 billion.

165. The statements contained in ¶¶ 163 and 164 above were materially false and misleading when made because Macy's and its officers and directors failed to disclose the following: (a) Macy's had materially overstated its projected sales and earnings for the fiscal year 2007; (b) Macy's could not meet these overstated projections for the fiscal year 2007; (c) the merger between Macy's and May was plagued by integration problems; (d) the Integration Process was failing because of increased integration costs and the Company's strategy of reducing the number of coupons sales promotions made available to consumers, particularly to former May customers; (e) the Company's performance, particularly the earnings achieved by former May stores converted into the Macy's division, was being materially impacted by the Integration Process rather than merely by "snow and ice storms" or a "weakness

46

in home-related merchandise categories;" (f) failures in the Integration Process caused Macy's to experience diminished revenue streams, as consumer demand for Macy's brand products from the converted May stores diminished; and (g) that as a result of the above, the Company's fiscal projections were lacking in any reasonable basis when made.

166. Upon information and belief, the statements made in ¶¶ 155 through 164 were incorporated by reference into the Plans' SPDs and Prospectuses that were disseminated by the Plans' fiduciaries to Participants and/or made directly to the Participants.

**D.    Macy's Backtracks**

167. On May 10, 2007, Macy's revealed that the Company's April same-store sales were down 2.2%. In a press release issued that day Defendant Lundgren stated that "April sales were disappointing across the country in both new and legacy Macy's stores" and that a "major promotional event that was shifted from May last year to April this year did not produce the results we expected." The Company's release also stated that the Company expected same-store sales in May 2007 "to be in the range of flat to down 2 percent, which reflects the promotional event shift from May into April."

168. Macy's further revealed its financial woes in a Company press release issued before the market opened on May 16, 2007, entitled "Federated Reports First Quarter Earnings of 11 Cents Per Diluted Share from Continuing Operations, up from a Loss of 13 Cents Per Diluted Share Last Year; Diluted EPS is 16 Cents, Excluding Merger Integration Costs," Defendant Lundgren was quoted in the press release stating that "**sales in the new Macy's locations were disappointing in the quarter**," (emphasis added) and stated further: "Federated's guidance for total sales of $6.0 billion to $6.1 billion in the second quarter, compared with previous guidance of $6.1 billion to $6.2 billion."

169. Indeed, the press release further stated:

Sales in the first quarter totaled $5.921 billion . . . compared to sales of $5.930 billion in the same period last year. ***This is below the company's guidance for first quarter sales*** to be in the range of $6 billion to $6.1 billion.

On a same-store basis, the company expects second quarter sales to be flat to up 2 percent, versus prior guidance of up 1.5 percent to 2.5 percent. ***Earnings per diluted share, excluding merger integration costs, are now expected to be in the range of 35 to 45 cents, compared with previous guidance of 40 to 45 cents***, in the second quarter. The revised second quarter guidance reflects management's concern about uncertainty in the economic environment.

(Emphasis added).

170. In response to this announcement, the price of Macy's stock declined from $43.38 per share to $41.78 per share on extremely heavy trading volume.

171. During a call with financial analysts on May 16, 2007 Defendant Hoguet directly contradicted Defendant's previous representations (referenced in ¶ 156) that February 2007 sales at former May stored had continued to improve over fourth quarter of 2006 sales results, stating:

In February and March, our comp-store sales were only slightly lower than we had expected. However, in April, the gap to our expectations was wider. Also, **in February and March, the weakness was focused on the new Macy's or the former May doors**, and the Home business, particularly furniture. However, in April, the weakness was more widespread and included apparel areas in both the former May as well as the legacy doors...

(Emphasis added).

172. Defendants further revealed that customers of the former May stores had rejected the rapid conversion and that the Company's decision to dramatically cut the number of coupons that could be used at the former May locations had badly damaged sales. "'By cutting back as hard as we did, we clearly hurt the business,'" Defendant Hoguet stated.

173. On May 9, 2007, the day before Macy's initial disclosure of its decline in sales and its lowered second quarter sales forecast, Macy's common stock closed at $43.82 per share.

48

On May 17, 2007, however, after the market had received the news about Macy's "soft" and "disappointing" sales, Macy's common stock closed at $39.06 per share, a drop of approximately 11% from its May 9 closing price and approximately 17% from its trading high since Macy's announced its agreement and plan of merger with May on February 27, 2005.

174.    On August 15, 2007, the Company disclosed additional adverse, material information about its financial condition and the Integration Process which further shocked the market.

175.    Macy's revealed that it had posted a second quarter profit that was sharply lower than its original forecast and cut its full year guidance for 2007. In fact, the Company's second quarter earnings plunged to $74 million, or 16 cents a share, from $317 million, or 57 cents a share, marking a plummet of approximately 65%.

176.    Macy's also reported a 77% drop in its fiscal second quarter net income amid year-earlier gains. Sales for the second quarter slipped to $5.89 billion from $6 billion in the second quarter 2006, while same-store sales fell 2.6% in that same period. According to a Wall Street Journal news article dated August 15, 2007, Macy's "also cut its sales forecast for the rest of the fiscal year and sees earnings below analysts' expectations."

177.    The Company's plunge in its second quarter sales, net income and full-year projected earnings was attributed to failures in the Integration Process. That same Wall Street Journal news article dated August 15, 2007 stated that Macy's experienced its 77% drop in second quarter net income amid year-earlier gains, "as the company continues to struggle with the acquisition of May Department Stores." The article further explained:

> Macy's has been struggling with disappointing results at more than 400 stores it acquired from May in 2005. Most of them were converted to the Macy's brand in September. Shoppers at some of the stores have balked as Macy's eliminated coupons and introduced pricier fashions. Some analysts say J.C. Penny Co. and

49

Kohl's Corp. are stealing more price-conscious customers away from Macy's.

178.    A *MarketWatch* news article dated August 15, 2007 added that, "the company has struggled mightily to integrate the former May Co. stores into the Macy's division, which is now 800 stores." A primary cause of the company's integration struggles was its decision to prohibit the use of coupons and sales promotions that former customers of May stores grew accustomed to while shopping at May brand stores.

179.    *TheStreet.com* also issued a news article on August 15, 2007 that stated in relevant part:

> Many analysts had expected stronger earnings as the company neared the anniversary date of its conversion of 400 May store into Macy's, which mostly occurred last September. But Michelle Tan, an analyst for UBS, says Macy's moved too far, too fast to get customers to shift over from May stores.
>
> The company significantly cut back on the promotions that May store customers had been used to.
>
> Instead, 'you essentially ripped out the blanket from under the customers,' Tan says of Macy's.
>
> **'They did a shock to their system.**'

(emphasis added).

180.    The *MarketWatch* article dated August 15, 2007, revealed that, as a consequence of an unsuccessful Integration Process, "Macy's doesn't think it will meet Wall Street's projections."

181.    Moreover, the above *MarketWatch* article stated, "The Merger integration costs for the year are substantially higher than original expectations, ranging now at $150 million and $160 million compared with initial plans for $100 million to $125 million."

182.    Retail analysts noted that "merger issues were not adequately anticipated" and that "'[f]or all the strategic imperatives of the Macy's-May merger, the reality is that many of the

50

May stores didn't rise to the productivity norm of Macy's ...  Many of the May stores, not to mention Macy's stores still need renovation -- sometimes major renovation and merchandising.'"

*See Tough Road For Macy's:  As Net Falls 76 Percent, Retailer Lowers Outlook*, Women's Wear Daily, August 16, 2007.

183.    On September 30, 2007, an article published by the *New York Times News Service* included comments by Defendant Lundgren in which he publicly acknowledged that the abrupt curtailment of discount coupons was Macy's biggest misstep leading to declining sales during the first four months of fiscal 2007.  The article stated in pertinent part as follows:

> It was the boldest stroke in American retailing in decades.  The Macy's chain completed its takeover of 410 department stores around the country a year ago and renamed them all Macy's, vowing to lure shoppers with innovations like price scanners in the aisles and exclusive fashions from the likes of Oscar de la Renta.
>
> So far the grand plan is not working.
>
> A big reason?  Macy's forgot a basic law of human nature:  Shoppers love a deal.
>
> For years, the department stores that Macy's acquired, like Marshall Field's and Filene's, had relied on 15- and 20-percent-off coupons to alert people...that it was time to shop.  As part of its reinvention, Macy's tried to wean shoppers off them.
>
> *        *        *
>
> Now the company's chief executive, Terry J. Lundgren, one of the brightest stars in American retailing, is pleading mea culpa -- and backtracking.  Macy's pledges to issue plenty of coupons for the holiday shopping season...
>
> *        *        *
>
> [T]he changes amounted to 'too much, too fast;' Mr. Lundgren acknowledged in an interview...Mr. Lundgren said that abruptly curtailing discounts like coupons was Macy's biggest misstep, contributing to four consecutive months of falling store sales this spring.  Macy's stock has dropped more than 40 percent since it bought the May stores.

184.    News of the failed Integration efforts affected the market and the price of Macy's common stock, thus causing immense losses to the Plans.  Shares of Macy's common stock

dropped as low as $29.13 per share on August 16, 2007, representing a drop of approximately 34% from May 9, the day before Macy's initially disclosed its decline in sales and its lowered 2007 sales forecasts.

185. Throughout the fall of 2007 and into the winter of 2008 shares of Macy's stock continued to plummet reaching a Class Period low of $20.94 on January 11, 2008.

186. After a dismal holiday sales season, on February 7, 2008 Macy's announced a wave of job cuts:

> Faced with slumping sales and a plunging stock price, Macy's Inc. is making sweeping changes in the way it does business across the country that will eliminate 910 jobs in Minneapolis and 1,400 others nationwide...Macy's unveiled the changes, which it said are aimed at returning more control of store operations to local managers, following a terrible January, when sales dropped a steeper-than-expected 7.1 percent. Jittery consumers are the latest blow to the retailer's widely criticized strategy, launched after a 2005 blockbuster purchase of troubled St. Louis-based May Department Stores, or remaking regional chains like Marshall Field's into a homogenous brand. 'The bottom line is, the reason they're doing this is their earnings are terrible, they're losing market share, the merger is not working as planned and they have to cut costs and that's what they're doing,' said Howard Davidowitz, chairman of Davidowitz & Associates Inc., a national retail consulting and investment banking firm in New York. *See Macy's Plans to Slash 910 Jobs in Twin Cities: Buying, Marketing Positions Will Be Moved to New York*, Pioneer Press- McClatchy Tribune Information Systems, February 10, 2008.

187. This announcement came one day after Macy's issued its Form 8-K announcing that it would take a $150 million pre-tax charge in 2008 for expenses related to "division consolidations." In a press release accompanying its fiscal 2008 guidance the Company stated that it was "assuming a continued challenging economic environment through most of the year with some modest improvement expected by the fourth quarter."

### *Defendants Suffered From Conflicts of Interest*

188. Several Officer Defendants and Director Defendants did not share in the Plans' losses, however, as they apparently realized the imprudence of their investments in Macy's common stock and sold their own shares before the stock price plummeted.

189. Between the Company's February 27, 2005 announcement of its merger agreement with May and the Company's disclosures of their financial problems on May 10, 2007, a number of Officer Defendants and Director Defendants completed unusually large stock sales, selling over *four hundred thousand* shares of personally held Macy's common stock for more than *$19 million* in proceeds. For example:

| Name/Position | Shares Sold Between 2/27/07 and 5/10/07 | Sale Price Per Share | Proceeds |
|---|---|---|---|
| **Lundgren, Terry J.** Chairman, President and CEO | 279,420 | $46.00-46.37 | $12,883,084 |
| | 45,580 | $44.88 | $2,027,398 |
| **Karen Hoguet,** Chief Financial Officer and Executive Vice President | 84,000 | $44.37 | $3,727,080 |
| **Levinson, Sara,** Director, member of the Compensation and Management Development Committees | 3,500 3,500 | $46.01 $45.80 | $161,035 $160,300 |
| **Weatherup, Craig E.,** Director and Chairman of the Compensation and Management Development Committees | 1,000 2,000 1,700 300 2,000 | $44.39 $44.38 $44.32 $44.33 $44.30 | $44,390 $88,760 $75,344 $13,299 $88,600 |
| **Total:** | 423,000 | | $19,269,290 |

190. The Company's public filings make clear that a significant percentage of its officer and director compensation is in the form of stock grants or stock option grants.

53

191.    Because the compensation of many of the Defendants was significantly tied to the price of Macy's common stock, Defendants had an incentive to keep the Plans' assets heavily invested in Macy's common stock on a regular, ongoing basis. Reduction and/or elimination of Macy's common stock as an investment option would have reduced the overall market demand for Macy's common stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Macy's common stock, resulting in lower compensation for the Defendants.

192.    Moreover, keeping the Plans' assets heavily invested in Macy' common stock allowed certain fiduciaries of the Plans to sell their personally held Macy's common stock at artificially inflated prices. ***Specifically, as the above chart in ¶ 189 demonstrates, certain fiduciaries collectively sold over $19 million worth of personally held Macy's common stock during the Class Period.*** This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Macy's common stock when they became aware of the problems with the Integration Process; they did *not,* however, divest the Plans' investments in Macy's common stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

193.    Some Defendants may have had no choice in tying their compensation to Macy's common stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Macy's common stock.

194.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

### *Failure to Adequately Disclose Fees and Expenses of the 401(k) Plan*

54

195. Neither the Macy's SPD, the Annual Report for the 401(k) Plan nor the Form 11-K filed with the SEC provide complete and accurate disclosures to Participants regarding the fees and expenses being charged to the 401(k) Plan that reduces Participants' account balances. This is inconsistent with ERISA and DOL guidelines.

196. The Macy's SPD states that participants may contact Macy's for information concerning a "description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative." MAC0000396.

197. Plaintiff contacted Macy's for the foregoing information but only received limited information concerning the annual operating expenses of the Plan. Given the numerous ways in which services are provided to employee benefit plans and the way in which service providers are compensated, Plaintiff has not been able to obtain sufficient information to make informed decisions with regard to investment alternatives.

198. The 401(k) Plan's fiduciaries have not told Participants, and Plan participants do not know:

    a.    the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2)(i); and

    b.    the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. § 2550.404c-1(b)(2)(ii)(A).

199. As a result of the 401(k) Plan's fiduciaries' failure to provide accurate information, and the general failure on the part of the fiduciaries to disclose the actual expenses of the 401(k) Plan, Participants have not been provided with "the opportunity to obtain sufficient

information to make informed investment decisions with regard to investment alternatives under the plan." 29 C.F.R. § 2550.404c-1(b)(2)(1)(B).

200.    Because Defendants have not provided the Participants with this information, Participants have lacked the information necessary to understand and protect their interests in the 401(k) Plan and/or have knowledge of, Defendants' breaches of fiduciary duty with respect to the reasonableness of the fees and expenses incurred with respect to their respective individual plan accounts.

201.    Defendants have an affirmative obligation to provide full and accurate information to Participants regarding administration of the Plans. Defendants' non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation, and a breach of fiduciary duty.

202.    Based on the foregoing, Defendants are not entitled to the safe harbor protections of ERISA 404(c).

## REMEDIES FOR DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES

203.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plans' assets should not have been so heavily invested in the Company Stock Fund. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

204.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

205. With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the plan had been properly administered.

206. Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in the amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; (6) adequate and accurate disclosure of all fees and expenses associated with the administration and management of the Plans; and (7) such other legal or equitable relief as may be just and proper.

207. Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants)

208.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

209.   At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

210.   Defendants were responsible for the selection, maintenance and monitoring of the Plans' investment options, including the option to purchase and to hold investments in the Company Stock Fund.

211.   Defendants exercised discretionary authority and/or control over management of the Plans or disposition of the Plans' assets and were, during the Class Period, responsible for ensuring that investment options made available to Participants were prudent. Defendants were responsible for ensuring that all investments in the Company Stock Fund in the Plans were prudent, and are liable for losses incurred as a result of such investments being imprudent.

212.   Defendants should have known that throughout the Class Period, Macy's issued false and misleading statements regarding the strength of its business and the success of the Integration Process. Defendants should have further known that Macy's failure to disclose its financial and integration problems artificially inflated the Company's reported sales and revenue, as well as the value of its common stock.

213.   Based upon the insider sales of Macy's common stock, the Plans' fiduciaries should have recognized the imprudence of Participants continuing their investments in Macy's common stock.

214. Participants, in contrast, invested in Macy's common stock relying on the Company's financial misstatements and omissions and Defendants' continued offering of Macy's common stock as an investment option under the Plans. Because Defendants never disclosed adverse, material information to Participants, at the time that Participants made such investments, Participants were without knowledge of the facts concerning the inaccurate statements and omissions alleged herein which revealed the imprudence of investing in the Macy's common stock.

215. In direct violation of their duty of loyalty to the Plans and their members, Defendants failed to diverge from the Plans' documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Participants. Defendants, either themselves or through persons they direct or control, blindly followed the Plans' documents and directives, leading to an imprudent result that harmed the Participants.

216. Defendants breached their duties to prudently and loyally manage the assets of the Plans. During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in the Company Stock Fund was imprudent in that any such investment was unsuitable and inappropriate for either Participant contributions or Company matching contributions to the Plans. During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer the Company Stock Fund as an investment option for the Plans and to direct and approve the Plans' investment in the Company Stock Fund, instead of other investments as permitted by the Plans. Despite the imprudence of any investment in the Company Stock Fund during the Class Period, Defendants failed to take adequate steps to prevent the Plans, and indirectly the Participants, from suffering losses as a result of the Plans' investment in the Company Stock Fund.

217.    Defendants also breached their duty of loyalty by failing to administer the Plans with single-minded devotion to the interests of the Plaintiff and the members of the Class, regardless of Defendants' own interests.

218.    Defendants also breached their fiduciary duties by failing to disclose that they had failed prudently and loyally to manage the assets of the Plans in the exercise of their discretion with respect to the Company Stock Fund as an investment option in the Plans.

219.    As a direct and proximate result of Defendants' breaches of their fiduciary duties owed to the Plaintiff and the Class, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants' are liable.

## COUNT II

### Failure to Monitor the Plans and to Provide the Administrator Of the Plans and Other Fiduciaries With Accurate Information Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against Macy's, Director Defendants and the Plan Committee)

220.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

221.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  By virtue of their fiduciary responsibilities, Defendants were bound to monitor the other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plans and their investments.

222.    The Director Defendants maintained discretionary authority and control with respect to appointing the members of the Plan Committee to manage and evaluate investment of the Plans' assets.  Accordingly, the Director Defendants breached their duties to monitor and inform by:

(a)    Failing to ensure that the Plan Committee, as a monitored fiduciary, had

access to knowledge about the Company's operations, financial results and the status of the Integration Process, as alleged above, which made the Company Stock Fund an imprudent retirement investment;

> (b) Failing to ensure that the Plan Committee appreciated the increased risk posed by the significant investment by rank and file employees in the Company Stock Fund; and

> (c) Failing to disclose to the Plan Committee accurate information about the operations and financial results of Macy's that Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment options the Plans should continue to offer.

223. At the same time, the Plan Committee maintained discretionary authority and control with respect to appointing the Investment Managers to manage, acquire, and dispose of the assets of the 401(k) Plan. Accordingly, the Plan Committee breached its duties to monitor and inform by:

> (a) Failing to ensure that the Investment Managers, as monitored fiduciaries, had access to knowledge about the Company's operations, financial results and the status of the Integration Process, as alleged above, which made the Company Stock Fund an imprudent retirement investment;

> (b) Failing to ensure that the Investment Managers appreciated the increased risk posed by the significant investment by rank and file employees in the Company Stock Fund; and

> (c) Failing to disclose to the Investment Managers accurate information about the operations and financial results of Macy's that Defendants reasonably should have known the monitored fiduciaries needed to make sufficiently informed decisions about what investment

61

options the Plans should continue to offer.

224.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT III

### Failure to Provide Complete and Accurate
### Information to the Plans' Participants and Beneficiaries
### Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### (Against All Defendants)

225.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

226.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

227.    During the Class Period, Defendants' fiduciary duties bound them to ensure that communications by and about the Plans and their assets were truthful, complete and not misleading, including information concerning the investment options offered under the Plans.

228.    Throughout the Class Period, Defendants failed to provide participants in the Plans with complete and accurate information regarding the Company's operations, financial conditions, and Integration Process necessary for participants in the Plans to accurately assess the quality of an investment in the Company Stock Fund. Instead, Defendants conveyed false and misleading material information to the investing public and to the Plaintiff and the Class, regarding the soundness of Macy's common stock and the prudence of investing retirement savings in the Company Stock Fund. Because large percentages of the assets of the Plans were invested in the Company Stock Fund during the Class Period, losses therefrom materially affected the value of Participants' retirement assets.

229. Throughout the Class Period, Defendants failed to properly inform and/or disclose to participants in the Plans the fees and expenses that are, or have been, paid by the Plans. Defendants failed to inform and/or disclose to participants in the Plans in proper detail and clarity the transactions, fees and expenses which affect participants' account balances in connection with the purchase or sale of interests in investment alternatives. Defendants failed to provide participants in the Plans with sufficient investment information to qualify for the safe harbor immunity of ERISA § 404(c), 29 U.S.C. § 1104(c).

230. Defendants' misrepresentations and omissions were material to the determination of Plaintiff and members of the Class whether investing in or maintaining their investments in the Company Stock Fund was prudent. As such, Plaintiff and members of the Class are presumed to have relied to their detriment on Defendants' misleading statements and omissions.

231. As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT IV

### Failure to Act Exclusively in the Interests of the Plans' Participants
### Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405
### (Against All Defendants)

232. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

233. During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

63

234. Defendants were duty bound to act with undivided loyalties to the Plans, binding them to discharge their responsibilities solely in the interest of Participants and for the exclusive purpose of providing benefits thereto.

235. Defendants breached their duty of loyalty by:

(a) Failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the Company Stock Fund;

(b) Failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transaction which made the Company Stock Fund an unsuitable investment for the Plans;

(c) Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d) With respect to each of the failures listed in the preceding subparagraphs, Defendants failed adequately to inform Plaintiff and members of the Class to prevent general investors, creditors and others from discovering the Company's financial and operational weaknesses as well as the failures of the Integration Process; and

(e) By otherwise placing the interests of Macy's and themselves above the interests of the Participants with respect to the Plans' investment in the Company Stock Fund, by among other things, keeping the Plans' assets heavily invested in Macy's common stock when it was imprudent to do so — rather than divesting the Plans' investments in Macy's common stock - while certain fiduciaries sold their personally held Macy's common stock at artificially inflated prices. As a result, certain fiduciaries personally profited from those sales while the Plans and the Participants suffered massive losses.

236.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly the Plaintiff and the members of the Class, suffered damages for which Defendants are liable.

## COUNT V

**Co-Fiduciary Liability**
**Breaches of Fiduciary Duties in Violation of ERISA § 405**
**(Against Officer Defendants, Director Defendants, and the Plan Committee)**

237.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

238.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

239.    As alleged herein, Macy's, through its officers and employees, such as Officer Defendants, Director Defendants, and the Plan Committee failed to provide material information to the Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices to the detriment of Plaintiff and members of the Class, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law. In addition, as alleged herein on information and belief, Macy's and the other Defendants named in this Count participated in and/or knew about the Company's misrepresentations regarding its materially

65

overstated sales and earnings projections for the fiscal year 2007 and its failures with the Integration Process. Thus, these Defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of Macy's common stock as an investment for the Participants' retirement assets.

240. Despite this knowledge, the Defendants named in this Count knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plans' investment and holding of Macy's common stock during the Class Period. Defendants did so by themselves making imprudent and disloyal decisions respecting the Plans' investment in Macy's common stock in the manner alleged herein in violation of ERISA § 405(a)(1)(A). In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plans' investment in Macy's common stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

241. In further violation of ERISA § 405(a)(1)(C), the Defendants named in this Count also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole. Instead, they compounded the problem by downplaying the significance of Macy's financial and integration problems and further concealing such practices from Participants and the market as a whole.

242. In addition, the Defendants named in this Count enabled the imprudent asset management decisions of any and all other Defendants — including any appointed fiduciaries of the Plans — who lacked knowledge of the circumstances rendering Macy's common stock

66

imprudent, by failing to provide such persons with complete and accurate information regarding Macy's common stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plans caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plans' investment in Macy's common stock. In so doing, these Defendants breached ERISA § 405(a)(1)(B).

243. Further, through their failure to properly and effectively monitor their appointees on the Plan Committee and the Investment Managers, and remove those fiduciaries whose performance was inadequate as alleged above, the Defendants named in this Count enabled these appointed fiduciaries' imprudent management of the Macy's Stock Fund in the Plans.

244. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants, lost a significant portion of their retirement investment.

245. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

### Prohibited Transactions in Violation of ERISA § 406
### (Against All Defendants)

246. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as fully set forth herein.

247. By virtue of all the facts and events alleged herein, Defendants, in connection with their actions and omissions in authorizing and causing the Plans to continue to offer the Company Stock Fund as an investment option during the Class Period and in permitting Plaintiff

67

and members of the Class to invest in the Company Stock Fund at a time when Defendants reasonably should have known that Macy's operational and financial health were deteriorating and the Integration Process was proving unsuccessful — material facts undisclosed or misrepresented to the public — and that as a result, the prices per share at which the Company Stock Fund was acquiring Macy's common stock grossly exceeded fair market value, caused the Plans to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plans and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

248.    Because the prices Defendants caused the Company Stock Fund to pay for such shares were materially, artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

249.    Macy's is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

250.    During the Class Period, Macy's common stock was artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plans to pay artificially inflated prices for the Macy's common stock.

251.    During the Class Period, the Plans invested millions of dollars in both participant and company-matching contributions in Macy's common stock, at artificially inflated prices. The Plans and the Participants thus over-paid for their "participation interests" in the Plans.

252.    Because the Plans' acquisitions of Macy's common stock at artificially inflated prices were prohibited transactions, a *per se* violation of ERISA § 406(a), 29 U.S.C. § 1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, on behalf of himself and the members of the Class, seeks to rescind all transactions purchasing shares of the Company Stock Fund.

253. Further, to restore the Plans and their participants and beneficiaries to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plans are entitled to recover the amount that the contributions used to purchase Macy's commons stock for the Company Stock Fund would have earned had such amounts been invested in suitable investment options.

## SECTION 404(C) DEFENSE INAPPLICABLE

254. As a direct or proximate result of Defendants breaches of the fiduciary duties they owed to Plaintiff and members of the Class, the Plans suffered losses, and the Plaintiff and the members of the Class suffered losses when substantial assets in the Plans were invested in the Company Stock Fund during the Class Period.

255. As to contributions invested in the Company Stock Fund, Defendants were responsible for the prudence of investments offered under the Plans unless Participants, themselves, effectively exercised informed control over the assets in the Plans in their individual accounts pursuant to ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated thereunder.

256. Defendants, however, did not comply with those provisions. Rather than taking the necessary steps to ensure effective participant control by complete and accurate disclosure of material information, Defendants did the opposite. As a consequence, Participants did not have informed control over the assets of the Plans that were invested in the Company Stock Fund, and Defendants remained entirely responsible for ensuring that such investments were and remained prudent.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, individually and on behalf of other members of the Class, prays for judgment as follows:

A.      Declaring this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class;

C.      Declaring that Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(1)(B);

D.      Compelling Defendants to reimburse the Plans for all losses thereto, resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the assets of the Plans, and to restore to the Plans all profits Defendants made through the use of the assets of the Plans, and to restore to the Plans all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

E.      Compelling Defendants to make adequate and accurate disclosures regarding fees and expenses of the Plans;

F.      Enjoining Defendants, together and individually, from any further violations of their fiduciary duties under ERISA;

G.      Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the individual accounts of Plaintiff and members of the Class in proportion to the losses of those accounts;

70

H.      Awarding Plaintiff and members of the Class damages as a result

of the wrongs complained of herein, with pre-judgment and post-judgment interest;

I.      Awarding Plaintiff and members of the Class their costs and

expenses in this litigation, including reasonable attorneys' fees and experts' fees and

other costs and disbursements; and

J.      Awarding Plaintiff and members of the Class such other and

further relief as the Court may deem just and proper.

Dated:  May 16, 2008

　　　　　　　　　　　　　　　　　／s／  Stephen E. Imm
Stephen E. Imm
**KATZ GREENBERGER & NORTON, LLP**
105 East Fourth Street, 4th Floor
Cincinnati, Ohio 45202
Tel: (513) 721-5151
Fax: (513) 621-9285
sei@kgnlaw.com

**HARWOOD FEFFER LLP**
Robert I. Harwood, Esq.
Jeffrey M. Norton, Esq.
488 Madison Ave., 8th Floor
New York, New York 10022
Tel: (212) 935-7400
Fax: (212) 753-3630
rharwood@hfesq.com
jnorton@hfesq.com

**MILBERG LLP**
Lori G. Feldman (admitted *pro hac vice*)
Arvind B. Khurana (admitted *pro hac vice*)
One Pennsylvania Plaza
New York, NY, 10119-0165
Tel: (212) 594-5300
Fax: (212) 868-1229
lfeldman@milberg.com
akhurana@milberg.com

***Attorneys For Plaintiff***

71

Shanehchian, Ebrahim - Amended Class Action Complaint for Violations of the Employee Retirement Income Security Act of 1974

**OF COUNSEL:**
**LAW OFFICE OF ALFRED G. YATES JR., PC**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 391-5164
Fax: (412) 471-1033
yateslaw@aol.com

72

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amended Class Action Complaint for Violations of the

Employee Retirement Income Security Act of 1974 was served on the following counsel of

record on May 16, 2008 by electronic mail through the Court's CM/ECF system:

Jeremy P Blumenfeld
Brian T Ortelere
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

J Todd Kennard
Jones Day
P.O. Box 165017
Columbus, OH 43216-5017

/s/  Stephen E. Imm
Stephen E. Imm